No. 23-3411

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

Robert F. Kennedy, Jr.,

*Plaintiff-Appellant*,

vs.

Google LLC, and YouTube, LLC,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-03880-TT
Hon. Trina Thompson

_____

## APPELLANT'S OPENING BRIEF

_____

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

*Attorneys for Robert F. Kennedy, Jr.*

# DISCLOSURE STATEMENT

Mr. Kennedy has no information to report under Rule 26.1 of the Federal Rules of Appellate Procedure.

Date:  December 6, 2023

JW HOWARD/ATTORNEYS, LTD.


*s/ Scott J. Street*
Scott J. Street

*Attorneys for Robert F. Kennedy, Jr.*

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT……………………………………………
**Error! Bookmark not defined.**

TABLE OF AUTHORITIES………………………………………… iv

INTRODUCTION………………………………………………. 1

JURISDICTIONAL STATEMENT…………………………………... 4

STATUTORY AND CONSTITUTIONAL PROVISIONS…………… 5

ISSUES PRESENTED…………………………………………. 5

STATEMENT OF THE CASE………………………………………… 6

SUMMARY OF THE ARGUMENT………………………………….. 16

STANDARD OF REVIEW……………………...………………….. 17

ARGUMENT…………………………………………………… 18

    A.    YouTube's Medical Misinformation Policy—Which Was Developed in Response to Government Demands for It and Which Relies Entirely on the Government to Decide Which Information to Censor—Likely Violates the First Amendment…………………………………18

    B.    Mr. Kennedy Will Be Irreparably Harmed If the Court Allows Google to Continue Using its Misinformation Policy to Remove His Political Speech from YouTube…………………………………….... 32

ii

C.    Google Is Not a Publisher, So It Will Not Suffer from Being Ordered Not to Remove Video of Kennedy's Political Speech…………40

D.    The Public Interest in Having Open Dialogue During the Political Process Strongly Favors Granting Injunctive Relief…………..43

E.    The Court Should Decide This Appeal as Quickly as Possible…….46


STATEMENT OF RELATED CASES……………………………………....48

CERTIFICATE OF COMPLIANCE…………………………………………..49

CERTIFICATE OF SERVICE……………………………………………….50

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C.L.U. of Nev. v. City of Las Vegas*,
466 F.3d 784 (9th Cir. 2006)……………………………………………33

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) …………………………..……………17

*Am. Mfrs. Mutual Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) …………………………………...…………28

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014)…………..……………………..……17

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) …………………………………...…………3

*Atkinson v. Meta Platforms, Inc.*,
No. 20-17489, 2021 WL 5447022 (9th Cir. Nov. 22, 2021)……………….26

*Berger v. City of Seattle*,
569 F.3d 1029 (9th Cir. 2009)………………………………………...35

*Beshear v. Butt*,
863 F. Supp. 913 (E.D. Ark. 1994)…………………….……………….35

*Biden v. Knight First Amend. Inst.*,
-- U.S. --, 141 S. Ct. 1220 (2021)……………………………………39

*Blum v. Yaretsky*,
457 U.S. 991 (1982)…………………………………………………..19

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001)……………………………………………15, 19

*Broderick v. Oklahoma*,

    413 U.S. 601 (1972)……………………………………………………..36

*Brown v. Hartlage*,

    456 U.S. 45 (1982) …………………………………………….…… 38-39

*Buckley v. Valeo*,

    424 U.S. 1 (1976) ……………………………….………....33, 38

*Bullfrog Films, Inc. v. Wick*,

    847 F.2d 502 (9th Cir. 1988). ………………………………...… 34-35

*Butler v. Ala. Judicial Inquiry Comm'n*,

    111 F. Supp. 2d 1224 (M.D. Ala. 2000)……………………….…..35

*Caribbean Marine Servs. Co. v. Baldrige*,

    844 F.2d 668 (9th Cir. 1988)………………………………….…..44

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,

    827 F.2d 1291 (9th Cir. 1987). …………………………………….31

*Citizens United v. F.E.C.*,

    558 U.S. 310 (2010) ……………………………………………..46

*Cohen v. Cal.*,

    403 U.S. 15 (1971)..……………………………………….…..28

*Cuviello v. City of Vallejo*,

    944 F.3d 816 (9th Cir. 2019) ……………………………………..44

*Daunt v. Benson*,

    956 F.3d 396 (6th Cir. 2020) ……………………………………..37

*Denver Area Ed. Telecomms. Consortium, Inc.*,

    518 U.S. 727 (1996) ……………………………………………..28

*Doe v. Google, LLC*, No. 21-16934,

    2022 WL 17077497 (9th Cir. Nov. 18, 2022) …………………...…25

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014) ……………………………….…..43

*Dow Jones & Co. v. Kaye*,
  90 F. Supp. 2d 1347 (S.D. Fla. 2000) …………………………….....44

*Elrod v. Burns*,
  427 U.S. 347 (1976). ……………………………………………37

*Farris v. Seabrook*,
  677 F.3d 858 (9th Cir. 2012) …………………………………………38

*Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*,
  192 F. Supp. 3d 1120 (E.D. Cal. 2016) …………………………………37

*Gallagher v. Neil Young Freedom Concert*,
  49 F.3d 1442 (10th Cir. 1995) …………………………………………..21

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972). ……………………………………………35

*Griffin v. Bryant*,
  30 F. Supp. 3d 1139 (D.N.M. 2014) …………………………………  37-38

*Heineke v. Santa Clara Univ.*,
  965 F.3d 1009 (9th Cir. 2020). …………………………………………27

*Howerton v. Gabica*,
  708 F.2d 380 (9th Cir. 1983) …………………………………………19

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
  515 U.S. 557 (1995) …………………………………………41

*Index Newspapers LLC v. City of Portland*,
  474 F. Supp. 3d 1113 (D. Or. 2020) …………………………….…18

*Jackson v. Metropolitan Edison Co.*,
  419 U.S. 345 (1974) …………………………………………31

vi

*Kirtley v. Rainey*,

    326 F.3d 1088 (9th Cir. 2003)……………………………………………19

*Klein v. City of San Clemente*,

    584 F.3d 1196 (9th Cir.2009) ……………………………………… 37-38

*Lee v. Katz*,

    276 F.3d 550 (9th Cir. 2001) …………………………………1, 19, 28-29

*Lopez v. Heckler*,

    713 F.2d 1432 (9th Cir. 1983) ……………………………………………17

*Lugar v. Edmondson Oil Company*,

    457 U.S. 922 (1982) ………………………………………………………30

*Manhattan Cmty. Access Corp. v. Halleck*,

    -- U.S. --, 139 S. Ct. 1921 (2019) ………………………………………19

*Mathis v. Pac. Gas & Elec. Co.*,

    891 F.2d 1429 (9th Cir. 1989) ………………………………..……… 30-31

*McIntyre v. Ohio Elections Comm'n*,

    514 U.S. 334 (1995). ………………………………………..………..33

*Miami Herald Publ'g Co. v. Tornillo*,

    418 U.S. 241 (1974) ……………………………………………...…41

*Mills v. Alabama*,

    384 U.S. 214 (1966). ………………………………………………33

*Missouri v. Biden,*

    No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4, 2023) …. *passim*

*Moose Lodge No. 107 v. Irvis*,

    407 U.S. 163 (1972) ……………………………………………….30

*NetChoice, L.L.C. v. Paxton*,

    49 F.4th 439 (5th Cir. 2022) ………………………………..… 31, 42

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ……………………………………………..…35

*O'Handley v. Weber*,
  62 F.4th 1145 (9th Cir. 2023) ……………………………………… 25-27

*Pac. Gas & Elec. Co. v. Public Utilities Comm'n of Cal.*,
  475 U.S. 1 (1986) …………………………………………………1, 40-41

*Packingham v. North Carolina*,
  -- U.S. --, 137 S. Ct. 1730 (2017) …………………………………………39

*Puerto Rico Ass'n of Mayors v. Velez-Martinez*,
  480 F. Supp. 3d 377 (D.P.R. 2020) …………………………….…………38

*Rawson v. Recovery Innovations, Inc.*,
  975 F. 3d 742 (9th Cir. 2020) …………………………………....…15, 20, 27

*Recycle for Change v. City of Oakland*,
  856 F.3d 666 (9th Cir. 2017) …………………………………………33

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) …………………………….……………………32

*Roberts v. AT&T Mobility, LLC*,
  871 F.3d 833 (9th Cir. 2017) ……………………………………………27

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) …………………………………………....…18, 37

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) …………………………………………….....…41

*Rutenberg v. Twitter, Inc.*,
  No. 21-160743, 2022 WL 1568360 (9th Cir. May 18, 2022) ………..….…25

*Sec'y of State v. Joseph H. Munson Co.*,
  467 U.S. 947 (1984) …………………….……………………………43

*State v. Biden*,

    83 F.4th 350 (5th Cir. 2023) (per curiam) …………………………... *passim*

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,

    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) …………………………41

*Sutton v. Providence St. Joseph Medical Center*,

    192 F.3d 826 (9th Cir. 1999) ……………………………………………29-31

*Thornhill v. Alabama*,

    310 U.S. 88 (1940). …………………………………………………...45

*Tunick v. Safir*,

    209 F.3d 67 (2d Cir.2000) …………………………………………………43

*Turner v. U.S. Agency for Global Media*,

    502 F. Supp. 3d 333 (D.D.C. 2020). …………………………………… 36

*Turner Broad. Sys., Inc. v. F.C.C.*,

    512 U.S. 622 (1994). …………………………………………………..4

*United States v. Kincaide*,

    379 F.3d 813 (9th Cir. 2004) …………………………………………45

*U.S. WeChat Users Alliance v. Trump*,

    488 F. Supp. 3d 912 (N.D. Cal. 2020)…..…………………….…………18

*Valle Del Sol Inc. v. Whiting*,

    709 F.3d 808 (9th Cir.2013) …………………………………………….37

*Villegas v. Gilroy Garlic Festival*,

    541 F.3d 950 (9th Cir. 2008) ………………………………………… 20-21

*Warsoldier v. Woodford*,

    418 F.3d 989 (9th Cir. 2005). ……………………………………………...37

*Winter v. Natural Resources Defense Council, Inc.*,

    555 U.S. 7 (2008) …………………………………………………… 17-18

ix

**Statutes**

28 U.S.C. § 1292…………………………………………………4

28 U.S.C. § 1331…………………………………………………4

28 U.S.C. § 1367…………………………………………………4

47 U.S.C. § 230………………………………………….. 41-42

Fed. R. App. P. Rule 4…………………………………………5

**Other**

Alexander M. Bickel, *The Morality of Consent* 62 (2d ed. 1975)….34

H.R. REP. No. 104-458 (1996) ………………………………….41

## INTRODUCTION

This case challenges the conventional wisdom that private parties cannot violate the First Amendment. They can, especially when, as here, they engage in viewpoint discrimination during the political process to prevent people from hearing dissenting voices.

For most of the past forty years, in accordance with the urgings of Justices Brennan and Marshall, this Court applied the state action doctrine liberally. It emphasized that the analysis does not involve rigid criteria but focuses on determining whether seemingly private action is fairly attributable to the state. Most of those cases involved the deprivation of liberty or property rights. Indeed, until the recent social media cases, the Court had only decided one state action case alleging a First Amendment violation, *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2001), and it found against the private party that was regulating speech on private property. *Lee* recognized, as Justice Marshall did in *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), that speech is entitled to special protection, even when free speech rights are invoked against a private party that engages in viewpoint discrimination in a privately owned space.

Although it did not discuss *Lee*, this Court pulled back from that rationale in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), when it found no

constitutional problem with Twitter removing posts that government officials flagged for violating Twitter's civic integrity policy. That was a mistake. The internet is the modern public square. It is the place where millions of Americans get their news and discuss the issues of the day, especially during the political process. It is akin to the parks, sidewalks, squares, and billboards that the Supreme Court has always recognized as public fora for speech, even when those places are owned or controlled by a private party.

The panel seemed to recognize that in *O'Handley*. It noted that Twitter created the civic integrity policy itself, based on concerns that people had manipulated its product to mislead voters during the 2016 election. It emphasized the one-way nature of the communication. And it said, correctly, that a constitutional problem would arise if Twitter had agreed to serve as an arm of the government in censoring speech that the government did not want people to hear.

The Court did not find such evidence in *O'Handley* but it surely exists here. In fact, even at this early stage of litigation, the evidence (most of which was revealed during discovery in a similar case) is compelling. It shows that Google developed its current medical misinformation policy in response to the federal government's demands for more censorship. It shows that Google consulted with government officials when drafting the policy. And, most importantly, it shows that the speech that is subject to removal from YouTube is only speech that public

2

health officials—*i.e.*, the government—deem false, misleading, or dangerous. Speech that some people would call false, misleading, or dangerous—for example, that there are more than two genders or that abortion is safe and normal—is not subject to removal from YouTube because the current public health administration supports those messages.

The District Court seemed swayed by the fact that the speech Google seeks to block from YouTube involves public health. Google's counsel also invoked public health during the arguments below, suggesting that Google has a civic obligation to prevent people from hearing messages that might harm them, especially during a pandemic. That only strengthens Kennedy's argument. It is the government's job to promote public health. That is a public function. It is subject to constitutional scrutiny. Thus, it is reasonable to apply constitutional scrutiny when a private party like Google plays the middleman in that public function— particularly when, as here, it does so in partnership with the government and to get around First Amendment constraints that would indisputably apply to the government.

This is not a trivial matter. "The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). That is especially true in the political process. The Supreme Court has repeatedly

emphasized that "each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

Google's medical misinformation policy threatens that ideal. And it will not just hurt Mr. Kennedy's campaign. In his historic decision in the censorship case brought by the Missouri and Louisiana attorneys general, federal judge Terry Doughty noted that social media companies have targeted "conservative" speech, more than "liberal" speech, for censorship during the Biden Administration. That seems likely to continue, as Google's updated medical misinformation policy prohibits speech from conservative viewpoints about medical care, abortion, and transgender issues.

The First Amendment does not sanction such blatant viewpoint discrimination. It is time for this Court to apply the state action doctrine faithfully and to uphold the First Amendment principles upon which American democracy rests.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. This Court has jurisdiction pursuant to 28 U.S.C. § 1292. The District Court entered its order denying Kennedy's motion for a preliminary injunction on November 7,

2023. 1-Excerpts of Record ("ER")-002. Mr. Kennedy filed his notice of appeal on November 8, 2023. 6-ER-1350. The notice was timely filed. Fed. R. App. P. 4(a)(1)(A).

## STATUTORY AND CONSTITUTIONAL PROVISIONS

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law … abridging the freedom of speech …."

Article I section 2(a) of the California Constitution states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right."

## ISSUES PRESENTED

This appeal presents three primary issues:

(1) Whether the "serious questions" test or the "probability of success on the merits" test applies when deciding whether to grant preliminary injunctive relief in a case involving free speech during a political campaign.

(2) Whether YouTube's "medical misinformation" policy triggers constitutional scrutiny under the state action doctrine—and violates the First Amendment—because it engages in viewpoint discrimination and because it relies entirely on the government to decide which speech to remove from YouTube.

(3) Whether Google has a right under the First Amendment or section 230 of the Communications Decency Act to remove speech from YouTube because it disagrees with the content of that speech.

## STATEMENT OF THE CASE

Mr. Kennedy is a lawyer, a son of former Attorney General Robert F. Kennedy and a nephew of former President John F. Kennedy. He is a candidate for President of the United States, having declared his candidacy on April 19, 2023. 6-ER-1018.

Kennedy has long been a thorn in the side of public health officials and their political enablers. His criticism increased after Joe Biden took office in 2021. *Id.* The White House responded in kind. First it instructed Twitter executives to censor Mr. Kennedy's speech. 5-ER-1178. Then it turned to Google.

In April 2021, a White House staffer named Rob Flaherty reached out to Google executives, telling them that "we" (that is, President Biden and his White House staff) "remain concerned that YouTube is 'funneling' people into hesitance and intensifying people's hesitancy [to take the COVID-19 shots]." 5-ER-1079. Flaherty said that concern was "shared at the highest (and I mean highest) levels of the White House." *Id.* Flaherty told the Google executives that there was "more work to be done here." *Id.* He asked them to explain "what your road map to empowerment is." *Id.* And he said the White House was "excited to continuing

6

[*sic.*] partnering with you on this work … but we want to make sure that the work extends to the broader problem. Needless to say, in a couple of weeks when we're having trouble getting people to get vaccinated, we're going to be in the barrel together." 5-ER-1079-1080.

As of April 22, 2021, Google did not have—or, at least, was not enforcing—a vaccine misinformation policy for YouTube. 6-ER-1236.[1] Rather, Google began developing the current vaccine misinformation policy—the policy it used to censor Kennedy—in response to the White House's demands for it. 5-ER-1082.

Google seems to have embraced its role. Between April 2021 and September 2021, Google executives met numerous times with government officials from the Centers for Disease Control and the Office of the Surgeon General to discuss the executive branch's demand for more vaccine-related censorship. 5-ER-1079-1176.

But the executive branch was getting impatient. After all, President Biden had campaigned on a promise to eliminate COVID-19. By July 2021, a new variant was spreading. The president needed somebody to blame. Thus, on July 16, 2021, President Biden began calling COVID-19 a "pandemic of the unvaccinated." 5-ER-1180. Soon government officials also began using the term. *Id.* In the same

---

[1] Google's counsel produced a timeline of its misinformation policies below, but that document did not get turned over until during the hearing on Kennedy's motion. 2-ER-016. It has not been subject to discovery and raises more questions than it answers, as it suggests that Google only revised and began aggressively enforcing its vaccine related misinformation policy in response to pressure from the Biden Administration.

July 16 speech, Biden said technology companies like Google were "killing people" by not removing vaccine-critical speech from their platforms. 5-ER-1183. Around the same time, the Surgeon General issued an advisory calling on tech companies to aggressively remove criticism of the government's pro-vaccine message from their platforms. 5-ER-1185 .

When making these comments, the president targeted not just the tech companies but a group of commentators—called the "disinformation dozen"—that an activist group has targeted for censorship. 5-ER-1209. Biden explained: "Facebook isn't killing people – these 12 people are out there giving misinformation. Anyone listening to it is getting hurt by it. It's killing people. It's bad information." *Id.* Kennedy is part of that group. 6-ER-1216.

These comments, delivered by the Commander in Chief, revealed a plan to punish tech companies like Google if they did not go along with the Biden Administration's censorship goals. They were corroborated by other threatening statements made by executive branch officials about the tech companies' responsibility to censor dissenting public health viewpoints, and the consequences if they did not do so—namely that the White House would push to eliminate the companies' section 230 immunity and bring more enforcement actions against them. Indeed, within days of President Biden's July 16 "misinformation" speech, CNN reported that "[t]he White House is reviewing whether social media

8

platforms should be held legally accountable for publishing misinformation via Section 230, a law that protects companies' ability to moderate content …." 5-ER-1212.

The tech companies, especially Google, got the message. Google executives met with officials from the Surgeon General's office at least twice during the two weeks after President Biden's speech. 5-ER-1082, 1083; 5-ER-1119. They also met on September 14, 2021, to discuss "a new policy that [Google was] working on as well as [to] provide an update on our overall efforts to combat harmful COVID-19 misinformation on [YouTube]." 5-ER-1083. That "new policy" was the vaccine misinformation policy that Google has used to censor Mr. Kennedy's speech about public health matters, and which it announced on or around September 29, 2021. 5-ER-1124.

Google was inconsistent in applying its vaccine misinformation policy on YouTube during 2021 and 2022, although the threat of censorship (and the related strike that could get offenders suspended or banned from YouTube) caused Mr. Kennedy to often self-censor his comments. 6-ER-1216. The censorship project ratcheted up during 2023, though, as Kennedy prepared to challenge Mr. Biden for the Democratic Party's presidential nomination.

Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in

the Nation" primary. 5-ER-1018. He accepted an invitation to speak about that and other issues at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") in March. *Id.* His speech, which was viewed as a political speech and attended by several prominent New Hampshire Democrats, including the chairman of New Hampshire's Democratic Party, lasted nearly two hours. *Id.* It centered on Mr. Kennedy's concerns about the corrupt merger of corporate and state power, a danger he has fought for years and which, in recent years, caused him to question the increasing number of vaccines American children are required to take. 5-ER-1018-19.

Manchester Public Television posted a video of Mr. Kennedy's speech on YouTube. 5-ER-1019. Google removed it. *Id.* The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before." 5-ER-1026-34.

Mr. Kennedy complained about the action, particularly since his comments about vaccine safety only consumed a portion of the NHIOP speech (in other parts he spoke about his environmentalism and legal work fighting corporate polluters, among other things). 5-ER-1018-19. Google refused to change its position. *Id.*; 6-ER-1216. Google has removed other videos of Kennedy since he announced his candidacy, including interviews he did with Jordan Peterson and Joe Rogan. 6-ER-

10

1215-16. Again, although Google cited its vaccine misinformation policy to justify these decisions, it removed the entire video. *Id.*

Mr. Kennedy complained to Google about these matters. *Id.* But, unlike some other companies, Google continued to use its misinformation policies (primarily the vaccine policy) to remove Kennedy's political speech from YouTube. *Id.* It will continue to do so throughout the 2024 campaign.

Indeed, after this case was filed, Google merged its COVID-19 and vaccine misinformation policies into a single "medical misinformation" policy. 5-ER-1019-20. The new policy is extraordinary. It added a host of topics that are subject to removal from YouTube, including:

- "Content that recommends the use of specific methods for the treatment of cancer when those have not been approved by local health authorities or the World Health Organization as safe or effective …."

- "Content that promotes use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19."

- "Claims that alternative treatments are safer or more effective than approved treatments for cancer."

- "Content that promotes diet and exercise instead of seeking approved treatment for cancer."

11

•    "Discouraging people from consulting a medical professional or seeking medical advice if they're sick with COVID-19."

•    "Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment for COVID-19 such as consulting a doctor or going to the hospital."

•    "Content that contradicts local health authorities' or the World Health Organization's guidance on the safety of chemical and surgical abortion."

•    "Promotion of alternative abortion methods in place of chemical or surgical methods deemed safe by health authorities."

5-ER-1047-52. These are just a few examples—the new policy spans multiple pages—and Google says it "isn't a complete list." 5-ER-1047.

Like the earlier policies, the new policy looks entirely to government sources to determine what information gets removed from YouTube. It prohibits people from saying anything "that contradicts local health authorities' (LHAs) or the World Health Organization's (WHO) guidance about specific health conditions and substances." *Id.* And it gets changed only "in response to changes to guidance from health authorities or WHO." *Id.*

Google's use of its medical misinformation policy to censor videos of his speech on YouTube is just one of the many obstacles that Mr. Kennedy has had to deal with during the campaign. But it has a huge impact because YouTube has

12

become an important platform for political campaigns, especially when it comes to raw content like candidate interviews and speeches. 5-ER-1053-71. YouTube is an especially important platform for Mr. Kennedy, an independent presidential candidate who many mainstream media outlets have simply refused to cover. 6-ER-1216.

Kennedy has repeatedly asked Google to stop applying its misinformation policies to censor him during the presidential campaign. *Id.* It refused. *Id.* Kennedy has also had to self-censor his message, omitting topics that he would otherwise talk about because of the danger that his speech will be removed from YouTube and that he will be blocked from communicating with people there. *Id.*

That led to the filing of this case. Others like it are being litigated in other courts, most notably in the Fifth Circuit Court of Appeals. *State v. Biden*, 83 F.4th 350 (5th Cir. 2023) (per curiam). *Biden* was the first case to order discovery into the public/private campaign to remove alleged "misinformation" from technology platforms like Google/YouTube. The Supreme Court granted review (the case is now called *Murthy v. Biden*, Supreme Court Case No. 23-411) and will hear argument next spring.[2]

Shortly after the Fifth Circuit's argument in *Biden*, Mr. Kennedy filed an application for a temporary restraining order in the District Court. Dist. Ct. ECF 7.

---

[2] To avoid confusion, we refer to all the decisions from this case as *Biden*.

The application was eventually heard by District Judge Trina Thompson. At the argument, Google's attorneys made clear that Google has no intention of rescinding its medical misinformation policies and that Google believes it has an obligation to remove alleged medical "misinformation" from YouTube. 6-ER-1333-34. Indeed, shortly before the argument, Google amended its medical misinformation policy by merging the COVID-19 and vaccine misinformation policies into the policy described above. 5-ER-1020.

On August 23, Judge Thompson issued an order denying Mr. Kennedy's application for a TRO. 1-ER-004. Judge Thompson believed that the balance of equities favored Kennedy over Google. 1-ER-012. She also believed that the public interest favors more speech, not less. 1-ER-013. But she denied the application because she did not believe that Google can be held liable under the state action doctrine for using its government-dependent misinformation policies to remove videos of Mr. Kennedy's political speech from YouTube. 1-ER-012-014. Judge Thompson gave no weight to Judge Doughty's decision in *Biden*, which, while focusing on the government's efforts to coerce Facebook and Twitter into censoring its critics, also described how Google embraced the Biden Administration's censorship efforts in 2022, developing is vaccine misinformation policy in response to them and in collaboration with government officials. Instead, Judge Thompson held that she was bound by this Court's decision in *O'Handley v.*

14

*Weber*, 62 F.4th 1125 (9th Cir. 2023), which she construed to set a high bar for state action cases and to preclude relief. 1-ER-012-013.

Judge Thompson gave short shrift to *Rawson v. Recovery Innovations, Inc.*, 975 F. 3d 742 (9th Cir. 2020), where this Court held that the state action analysis is a flexible concept that does not require the use of specific tests, or even specific facts, but focuses on determining, as required under Supreme Court caselaw, whether "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quotations omitted). Judge Thompson also ignored *Brentwood*, one of the Supreme Court's most recent state action cases, and described *O'Handley* as having "declined to extend *Rawson* …." 1-ER-010-011.

Judge Thompson found that the public interest supported denying Kennedy's application because of Google's asserted interest in "preventing widespread illness and death." 1-ER-013. According to the District Court: "The coronavirus still poses a health risk to certain individuals, and it would not serve the public interest to let medical misinformation proliferate on YouTube." *Id.* Judge Thompson did not address Mr. Kennedy's argument that the speech Google has censored during his campaign is not "misinformation" (whatever that means, since Google did not

produce evidence that anything Kennedy said was false) but political speech about matters of public concern that are highly relevant in the presidential campaign.

On August 31, 2023, Google filed a motion to dismiss Mr. Kennedy's complaint. Dist. Ct. ECF 37. It was set for a hearing on November 7, 2023, but was continued to January 16, 2024. Instead, the District Court heard oral argument on Kennedy's motion for a preliminary injunction on November 7, following additional briefing by the parties. 1-ER-017. The District Court denied Kennedy's request. 1-ER-002. The court did not issue a new decision and stated at the argument that the hearing, and the additional briefing, was designed primarily to create a more complete record for this Court's review. 2-ER-063-064. This appeal followed.

## SUMMARY OF THE ARGUMENT

The District Court erred in denying Mr. Kennedy's motion. At minimum, the evidence Kennedy marshaled raised serious questions about whether the medical misinformation policy that Google uses to remove Kennedy's speech from YouTube violates the First Amendment, via the state action doctrine, because the policy relies entirely on the government to justify the action. Moreover, YouTube is a public forum and Google has justified its decision to remove Kennedy's speech by citing its desire to promote public health. Promoting public health is a public function, not a private (or corporate) one. And while Google complains about

16

being forced to let Kennedy's speech circulate on YouTube—speech that it says it disagrees with—Google is not a publisher that has its own First Amendment rights. In fact, under section 230, Google cannot be held liable for speech on YouTube. That legal protection is the foundation of its business.

Finally, this Court has often discussed the importance of free speech and issued preliminary relief to promote the free exchange of ideas, especially during the political process. So has the Supreme Court. That principle, combined with the strength of Kennedy's legal arguments, calls for reversing the District Court's decision and granting the preliminary injunction.

## STANDARD OF REVIEW

The Court "review[s] the district court's legal conclusions de novo," while reviewing "the factual findings underlying its decision for clear error …." *Armstrong v. Brown*, 768 F.3d 975, 979 (9th Cir. 2014). To obtain injunctive relief, Kennedy had to demonstrate either (1) "a probability of success on the merits and the possibility of irreparable injury," or (2) "that serious legal questions are raised and that the balance of hardships tips sharply in [his] favor." *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (discussing latter test, which this Court has found to survive *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)). Although the parties disputed which of those tests apply here, courts in

this circuit often use the "serious questions" test instead of *Winter* when the case involves First Amendment rights. *See Index Newspapers LLC v. City of Portland*, 474 F. Supp. 3d 1113, 1125 (D. Or. 2020) (applying serious questions test, instead of *Winter*, to grant TRO in First Amendment case brought by media); *U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912, 916 (N.D. Cal. 2020) (applying serious questions test to grant injunction in First Amendment case brought by people using WeChat app).

## ARGUMENT

The Court should reverse the District Court's denial of Kennedy's motion because the combination of serious questions going to the merits, irreparable harm to Kennedy and his supporters, and harm to the public interest justify preliminary relief, especially since the injunction will have no effect on Google.

### A. YouTube's Medical Misinformation Policy—Which Was Developed in Response to Government Demands for It and Which Relies Entirely on the Government to Decide Which Information to Censor—Likely Violates the First Amendment.

There is no doubt that the medical misinformation policy at issue in this case would violate the First Amendment if the government issued it. After all, it makes distinctions about which speech is allowed on YouTube based on the speech's content. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Thus, Google's primary argument is

18

that, unlike the government, *it* can decide which speech to allow, or not allow, on YouTube based on its content. It is wrong.

A "private entity is not ordinarily constrained by the First Amendment …." *Manhattan Cmty. Access Corp. v. Halleck*, -- U.S. --, 139 S. Ct. 1921, 1930 (2019). But it may be sued for violating a person's constitutional rights under certain circumstances. This Court recognizes "at least four different criteria, or tests, used to identify [such] state action: (1) public function; (2) joint action; (3) government compulsion or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (cleaned up). But it has also emphasized that "there is no specific formula for defining state action." *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (quotations omitted). Moreover, the tests discussed above are guideposts and "the criteria lack rigid simplicity." *Brentwood*, 531 U.S. at 295. The goal is to decide whether "seemingly private behavior may be fairly treated as that of the State itself." *Id.* (quotations omitted).

*Brentwood* represented a sea change in the Supreme Court's state action jurisprudence. It stopped the narrowing of the doctrine that had developed since the 1980s and moved the doctrine back to the functional and factual analysis that Justice Brennan had urged in cases like *Blum v. Yaretsky*, 457 U.S. 991, 1013 (1982) (Brennan and Marshall, JJ., dissenting). This Court did the same thing. For example, in *Lee v. Katz*, the court reversed a district court's decision that found no

state action in a case brought by preachers against a private party (the "OAC") who leased land (the "Commons") from the City of Portland. The OAC had occasionally excluded the preachers from preaching on the land, a plaza near Portland's basketball arena. The City played no role in excluding the preachers from the property: the OAC, a private entity, made that decision for its own reasons. 276 F.3d at 552-53. But the court "conclude[d] that, in regulating speech within the Commons, the OAC performs an exclusively and traditionally public function within a public forum." *Id.* at 557. That satisfied the state action doctrine.

Similarly, in *Rawson*, this Court reversed a grant of summary judgment for the defendant, a private entity that operated a private hospital, which the plaintiff sued after he was involuntarily committed at the hospital. The Court emphasized that, "[a]t bottom, the inquiry is always whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." 975 F.3d at 748 (quotations omitted). And it concluded that the private health care workers could potentially be held liable as state actors because a "county prosecutor played an outsized role in the duration of [the plaintiff's] detention" at the private facility. *Id.* at 754.

Other examples abound. Indeed, until 2021, on the rare occasion that this Court applied the state action doctrine narrowly, it did so over the objection of its most liberal judges. For example, in *Villegas v. Gilroy Garlic Festival*, 541 F.3d

20

950 (9th Cir. 2008) (en banc), the Court, sitting en banc, affirmed the district court's grant of summary judgment for the private association that operates the Gilroy Garlic Festival, and which was sued for excluding the plaintiff (the member of a group called the Top Hatters). Five judges dissented. They explained that, when "deciding whether conduct of private parties amounts to government action, we engage in a highly factual inquiry." *Id.* at 958 (Thomas, Wardlaw, Fisher, Paez and Gould, JJ., dissenting). They criticized the majority's focus on just one of the state action tests—not the one (joint action) that mattered—and they said that "in limiting its. analysis to whether organizing a garlic festival is an exclusive governmental function, the majority ignores both the ultimate state action inquiry and the Supreme Court's traditional means of answering that question: 'taking a flexible approach … and applying a variety of tests to the facts of each case.'" *Id.* at 960 (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (cleaned up).

Google's actions in removing Kennedy's speeches and interviews from YouTube satisfy several aspects of the state action tests and show that, at root, it is the government, not Google, that is responsible for getting Kennedy's speech removed from YouTube. After all, the misinformation policy that Google has used to remove Kennedy's speech from YouTube relies *entirely* on the government to decide what speech is false, misleading, or dangerous. 5-ER-1047. The policy

21

changes only when public health officials—that is, the government—changes their guidance about certain issues. *Id.* In fact, according to the misinformation policy, if public health authorities said that birds can talk but can't fly, a person would be prohibited from posting a video that says otherwise on YouTube—at least until the public health authorities say otherwise.

Moreover, Mr. Kennedy has obtained evidence that Google worked with public health and other government officials to develop the current version of its medical misinformation policy. 5-ER-1079-1176. They did so not as part of a one-way information sharing agreement but through a deeply intertwined partnership in which the government told Google what information it thinks is false, misleading, and dangerous and Google crafted a policy that censors that information, and that information alone.

The fact that Google communicated and worked with executive branch officials to develop its current misinformation policy strengthens the state action analysis. Many of the previous social media related state action cases were based on comments made by Democratic Party legislators. Unlike legislators, executive branch officials have direct regulatory authority over companies like Google. The record developed in *Biden* led Judge Doughty to describe it as "unrelenting pressure" which "had the intended result of suppressing millions of protected free speech postings by American citizens." 2023 WL 4335270 at *44.

22

Judge Doughty discussed that record at length in *Biden*. For example, with respect to Google/YouTube, Judge Doughty described several acts of coordination that raised constitutional problems, including meetings between Google/YouTube and officials from the White House, Surgeon General's office and Centers for Disease Control about the information that the government wanted to see removed. *Id.* at *9-15. Judge Doughty also described how the CDC and Census Bureau have regular meetings with Google/YouTube about removing alleged medical misinformation which "continue[ ] to the present day." *Id.* at *22, 27-28.

Judge Doughty had no problem finding these actions to constitute state action, and to violate the First Amendment, because at least some of the government officials "either exercised or provided significant encouragement, which resulted in the possible suppression of Plaintiffs' speech." *Id.* at *42; *see also id.* at *48 (emphasizing that both White House officials and tech executives referred to themselves as "'partners' and 'on the same team' in their efforts to censor disinformation, such as their efforts to censor 'vaccine' hesitancy"). Indeed, Judge Doughty concluded that federal government officials "aligned themselves with and partnered with" third parties like Google "to avoid Government involvement with free speech" that would clearly violate the First Amendment. *Id.* at *52.

23

The Fifth Circuit largely affirmed Judge Doughty's decision, most notably with respect to officials from the White House and Surgeon General's office. It focused on "coercion and significant encouragement—two distinct means of satisfying the close nexus test." *Biden*, 83 F.4th at 374. As to the latter, it found "that the clear throughline for encouragement in our caselaw is that there must be *some* exercise of *active* (not passive), *meaningful* (impactful enough to render them responsible) *contro*l on the part of the government over the private party's challenged decision." *Id.* at 375 (original emphasis). That can be demonstrated either by "entanglement in a party's independent decision-making" or by "direct involvement in carrying out the decision itself …." *Id.*

The court concluded that the White House and Office of the Surgeon General officials' actions satisfied both the coercion and significant encouragement tests. *Id.* at 381-88. As to encouragement, it noted that "the officials entangled themselves in the platforms' decision-making processes, namely their moderation policies." *Id.* at 387. They "had consistent and consequential interaction with the platforms and constantly monitored their moderation activities." *Id.* They did so not informally or indirectly but by "repeatedly communicat[ing] their concerns, thoughts, and desires to the platforms." *Id.* Critically, the court noted that "[t]he platforms responded with cooperation—they invited the officials to meetings,

24

roundups, and policy discussions. And, more importantly, they complied with the officials' requests, including making changes to their policies." *Id.*

These were not isolated actions. The court summarized its analysis as follows:

> Consequently, it is apparent that the officials exercised meaningful control—via changes to the platforms' independent processes—over the platforms' moderation decisions. By pushing changes to the platforms' policies through their expansive relationship with and informal oversight over the platforms, the officials imparted a lasting influence on the platforms' moderation decisions without the need for any further input. In doing so, the officials ensured that any moderation decisions were not made in accordance with independent judgments guided by independent standards. Instead, they were encouraged by the officials' imposed standards.

*Id.* at 388 (cleaned up).

The same reasoning applies here. *O'Handley* does not change that. That case arrived at a precarious time. Courts in the Northern District of California had dismissed several state action cases against technology companies, usually by deeming their allegations of joint action implausible. In each case, this Court affirmed the dismissal in a short order. *See Doe v. Google, LLC*, No. 21-16934, 2022 WL 17077497, at *1-3 (9th Cir. Nov. 18, 2022) (affirming dismissal because plaintiffs "failed to show any link between the alleged actions by the Speaker and the House and YouTube's decision to remove [their] channels"); *Rutenberg v. Twitter, Inc.*, No. 21-160743, 2022 WL 1568360, at *1 (9th Cir. May 18, 2022) (noting plaintiff's "acknowledge[ment] that Twitter exercised its own 'discretion

25

and authority' in moderating President Trump's account, and that Twitter acted as President Trump's 'opponent' in doing so); *Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL 5447022, at *1 (9th Cir. Nov. 22, 2021) (declining to infer that state officials "'dominate[d]' Meta Platforms' decision making"). Unlike the plaintiffs in the previous cases, Mr. O'Handley had evidence that Twitter suspended his account at least once after a California government agency called the Office of Elections Cybersecurity (OEC) notified Twitter of his post. O'Handley alleged that this government notification process constituted state action. 62 F.4th at 1153-55.

This Court struggled with those allegations, issuing a lengthy, published opinion after rejecting the previous cases in short, unsigned dispositions. It dispatched O'Handley's argument by stating that "[t]he OEC offered Twitter no incentive for taking down the post it flagged." *Id.* at 1158. It said the government "did nothing more than make a request with no strings attached. Twitter complied with the request under the terms of its own content moderation policy and using its own independent judgment." *Id.* Of course, in saying that, the Court improperly drew inferences in Twitter's favor. The panel seemed to recognize that, qualifying its analysis by noting that "a single act of independent judgment does not fully insulate a private party from constitutional liability when the party is otherwise deeply intertwined with the government," but it concluded that "we do not see the

26

high degree of entwinement needed for state action in this case." *Id.* at 1158 n.2 (citing *Rawson*).

That high degree of entwinement exists here. Moreover, *O'Handley* said "[a] constitutional problem would arise if Twitter had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals." *Id.* at 1159. That is exactly what Google is doing to public health critics like Kennedy. It is removing speech that public health authorities (the government) deem false, misleading, or dangerous, and it seems to be doing so voluntarily, as part of its civic duty to combat alleged misinformation. That cooperation, combined with the shared goals, distinguishes this case from *O'Handley*.

This does not mean that Google had to cloak itself in the power of the state, nor that Mr. Kennedy must identify a specific threat made by a government official that got Google to do its bidding, although he has obtained evidence of White House officials directing tech companies to censor him. 5-ER-1079. True, merely accepting public funds and complying with generally applicable laws will not suffice. *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020). And laws that simply give legal protection to private actions (like arbitration agreements) do not automatically transform private action into state action. *Roberts v. AT&T Mobility, LLC*, 871 F.3d 833, 844-45 (9th Cir. 2017). For good reason, as the Supreme Court has said it "will not tolerate the imposition of constitutional

27

restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'" *Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) (cleaned up) (quotations omitted).

But if the state action doctrine means anything, it must be applied faithfully when a private party like Google does the government's bidding at the government's behest and to promote the government's preferred message.

That is especially important when the case involves political speech. "In the realm of speech and expression, the First Amendment envisions the citizen shaping the government, not the reverse; it removes 'governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity.'" *Denver Area Ed. Telecomms. Consortium, Inc.*, 518 U.S. 727, 782-83 (1996) (O'Connor, J., concurring in part and dissenting in part) (quoting *Cohen v. Cal.*, 403 U.S. 15, 24 (1971)).

That principle may explain *Lee v. Katz*, a unique case in which this Court "conclude[d] that, in regulating speech within" a public space, "the OAC [a private entity] performs an exclusively and traditionally public function within a public forum." 276 F.3d at 557. If Google were correct, the plaintiffs should have lost that case. After all, like Google, the OAC was a private entity regulating speech that

28

occurred on private property. *Lee* reflects a fundamental principle: freedom of speech is different than the interests the plaintiffs asserted in other state action cases. It is the foundation of American democracy. And when giant corporations work with the government to silence speech that the government does not want people to hear—in a forum otherwise open to all viewpoints—they assume the role of the censor and violate that right.

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999), did not hold otherwise. There a prospective employee (Sutton) could not get a job from a private hospital because he refused to give the hospital his social security number. He sued, alleging that the hospital's refusal to hire him violated his constitutional and statutory rights. Essentially, Sutton argued that "because the federal government compels every employer to obtain employees' social security numbers, every employer is liable under [federal law] for violating the rights of employees (or applicants) who object on religious grounds to the social-security number requirement." *Id.* at 836. The court rejected that argument, finding that "in a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant. Indeed, without some other nexus between the private entity and the government, we would expect that the private defendant is not responsible for the government's compulsion." *Id.* at 838.

*Sutton* gave some examples. It noted that, in *Lugar v. Edmondson Oil Company*, 457 U.S. 922 (1982), the Supreme Court "held that the private defendants who had initiated the attachment process could be liable as state actors for 'participating in that deprivation'" because the act of inducing the "state officials to take advantage of state-created attachment procedures' made the private defendants 'willful participant[s] in joint activity with the State or its agents.'" *Id.* at 839 (quoting *Lugar*, 457 U.S. at 941-42). *Sutton* also explained that, in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177 (1972), the "private defendant was deemed to be acting in concert with the state when it sought the state's help to enforce the defendant's own racially discriminatory bylaws. Once again, the 'something more' required for a finding of governmental action on the part of a private defendant was satisfied when the plaintiff alleged that the private defendant and the state were jointly pursuing an unconstitutional end." *Sutton*, 192 F.3d at 840; *see also Biden*, 83 F.4th at 382 (concluding that "relationship between the officials and the platforms went beyond" mere advocacy and constituted "'something more'" needed satisfy state action doctrine).

As in *Biden*, that "something more" also exists here. Furthermore, *Sutton* distinguished *Mathis v. Pacific Gas & Electric Company*, 891 F.2d 1429 (9th Cir. 1989), a case in which this Court found the plaintiff's state action allegations to be sufficient at the pleading stage because the defendant sued for collaborating with

30

the government there was a public utility. "'It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be state 'acts' than will the acts of an entity lacking these characteristics." *Id.* at 843 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350-51 (1974)). *Sutton* distinguished another coercion/encouragement case, *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Company*, 827 F.2d 1291 (9th Cir. 1987), on the same ground. It also emphasized that, in *Carlin*, "the government directed a specific entity to take a specific (allegedly unconstitutional) action against a specific person." *Sutton*, 192 F.3d at 843.

So here. Mr. Kennedy has already obtained evidence that the White House directed Twitter to censor him. 5-ER-1079. Discovery would likely reveal similar directions from executive branch officials to Google, although the District Court denied Kennedy's request for limited discovery without explanation, even after Google opened the door to discovery by presenting its own evidence, which raised even more questions, at the preliminary injunction hearing. 2-ER-016.

That evidence is significant. Although Google may not have a legal monopoly on online video sharing, the Fifth Circuit found that it, like Facebook and Twitter, has an "effective monopoly over its particular niche of online discourse." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 476 (5th Cir. 2022).

31

Indeed, YouTube's influence is only growing. "As of 2023, the platform boasts 2.68 billion active users, as well as 80 million YouTube Premium subscribers. It's also established itself as the second-largest search engine in the world, next to its parent Google." 5-ER-1067. According to *Forbes*, more than half of internet users visit YouTube at least once per month. Those "staggering numbers aren't just statistics, either. They highlight the expansive influence and potential of social media platforms." 5-ER-1063. And they continue to grow.

Historically, this has been the type of situation in which the courts paid closer attention to the inherent nexus between the government and the private entity. Those factors, combined with the self-described public/private partnership and Google's reliance on government policies to censor speech, weigh in favor of finding state action here.

**B.      Mr. Kennedy Will Be Irreparably Harmed If the Court Allows Google to Continue Using its Misinformation Policy to Remove His Political Speech from YouTube.**

There is no dispute that Kennedy has alleged a colorable First Amendment claim and that he will suffer irreparable harm if the Court does not issue the requested injunction.

*Merits.* The government "has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quotations omitted). "A law that is content based

on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 165 (quotations omitted). A law is content based if it "draws distinctions based on the message a speaker conveys." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017). Such restrictions are "presumptively invalid" and can be upheld only if they represent "the least restrictive means of furthering a compelling government interest." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006).

Viewpoint discrimination that occurs in the political process is especially harmful. The First Amendment "affords the broadest protection" possible to political speech. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966). "Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day." *Buckley v. Valeo*, 424 U.S. 1, 52-53 (1976) (per curiam).

It does not matter that some people may find the affected speech to be dangerous, misleading, or even false (although the comments that Kennedy makes that usually get censored are true statements or opinions that the government says are misleading or lack "context"). "The social interest that the First Amendment vindicates is … the interest in the successful operation of the political process, so that the country may be better able to adopt the course of action that conforms to the wishes of the greatest number, whether or not it is wise or is founded in truth." Alexander M. Bickel, *The Morality of Consent* 62 (2d ed. 1975) (hereafter "Bickel"). Echoing that principle, "the Supreme Court has relied on the strong presumption that First Amendment protections have little to do with the caliber and quality of the speech involved, but … with the broad protection of the speech itself in order to encourage a robust exchange of ideas in political campaigns for elected office." *Butler v. Ala. Judicial Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1238 (M.D. Ala. 2000).

Thus, in *Butler*, a court invalidated a judicial canon that prohibited candidates from disseminating "true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person." *Id.* at 1233. The court noted the "difficulties [that] arise in ascertaining when the dissemination of 'true information' should be deemed 'deceiving or misleading'" including the fact that "[w]hat is 'deceiving or misleading' to one reasonable

34

person may not necessarily be 'deceiving or misleading' to another reasonable person." *Id.* at 1237. Similarly, in *Beshear v. Butt*, 863 F. Supp. 913, 916-17 (E.D. Ark. 1994), a court found that a judicial canon that prohibited candidates from "announcing views on disputed legal or political issues" was "substantially overbroad and vague" and thus violated the First Amendment. (Cleaned up.)

And, of course, in *New York Times Company v. Sullivan*, 376 U.S. 254, 271 (1964), the Supreme Court held that "[a]uthoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker." That is true especially in the political process and "even though the utterance contains 'half-truths' and 'misinformation.'" *Id.* at 273.

The government-guided censorship of Mr. Kennedy on YouTube violates these settled principles. It is content-based discrimination of speech that does not satisfy strict scrutiny. *See Berger v. City of Seattle*, 569 F.3d 1029, 1050-52 (9th Cir. 2009) (explaining why strict scrutiny governs this analysis). The medical misinformation policy is unconstitutionally vague because it does not "give a person of ordinary intelligence a reasonable opportunity to know what is prohibited" and because it encourages "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Indeed, although Google

35

often removes high-profile videos of Mr. Kennedy from YouTube, such as the Rogan and Peterson interviews, it does not remove them all. 6-ER-1221-22. That arbitrary enforcement undermines the misinformation policy's supposed necessity and creates a chilling effect that the Supreme Court has applied the vagueness doctrine strictly to avoid. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1988).

The misinformation policy also violates the overbreadth doctrine, as its "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broderick v. Oklahoma*, 413 U.S. 601, 612 (1972). This interest is particularly acute here as Google does not just use its misinformation policy to remove government dissent from YouTube: it reserves the right to sanction the people who post the speech. 5-ER-1051. Google's counsel said during the oral argument below that Google will continue doing that, even if it results in the censorship of Kennedy's political speech—including speech that has nothing to do with public health—and that "if plaintiffs want to or anyone else wants to edit the video to take out the part of the video that's violating its policies, of course they are free to do so." 6-ER-1340. That is precisely the type of self-censorship that the First Amendment prohibits. *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020).

*Irreparable harm.* There is also no dispute that Mr. Kennedy will suffer irreparable harm if the Court does not order Google to stop using its misinformation policy to censor some of Kennedy's speech during his political campaign. Nor could there be. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, this Court has held that irreparable injury is often presumed when the plaintiff alleges a "colorable First Amendment claim …." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005).

Judge Thompson held otherwise because she believed that Kennedy has other ways of communicating with voters. She erred. This Court "has repeatedly found irreparable harm to plaintiffs even where a speech restriction left them free to speak in other ways." *Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*, 192 F. Supp. 3d 1120, 1128 (E.D. Cal. 2016) (citing *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir.2009), and *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 827-28 (9th Cir.2013)). And, contrary to Google's arguments below, a plaintiff does not need to show that he, and he alone, is being censored, as "the Supreme Court has acknowledged that a party may claim viewpoint discrimination even when it is not the only one targeted for censorship." *Daunt v. Benson*, 956 F.3d 396, 419-20 (6th Cir. 2020) (citing *Rosenberger,* 515 U.S. at 831-32); *see also Griffin v. Bryant,* 30 F. Supp. 3d 1139, 1175-77 (D.N.M.

37

2014) (concluding that plaintiff had standing to challenge rule because it "most likely affected his speech," and because of lax standing requirements for such cases).

Moreover, "[t]he First Amendment protects political association as well as political expression." *Puerto Rico Ass'n of Mayors v. Velez-Martinez*, 480 F. Supp. 3d 377, 378 (D.P.R. 2020) (citing *Buckley*, 424 U.S. at 15). The chilling effect created by Google's use of the medical misinformation policy to censor Mr. Kennedy's political speech, even when posted by third parties, interferes with that right. 6-ER-1221-23.

Judge Thompson also erred in discounting the political nature of Mr. Kennedy's speech. The harm that accompanies the denial of First Amendment rights "is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and a delay of even a day or two may be intolerable." *Klein*, 584 F.3d at 1208 (cleaned up); *see also Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012) (upholding preliminary injunction against state's limitations on contributions to political committees in state or county recall campaigns for this reason). That may be why the Supreme Court has repeatedly rejected government efforts to control the information voters receive during the political process. *See, e.g., Brown v. Hartlage*, 456 U.S. 45, 61-62 (1982) (finding that application of state statute to invalidate election results based

on candidate's promise to serve at impermissible reduced salary violated First Amendment).

*Brown* is instructive. Like YouTube's government-based misinformation policy, the Kentucky statute imposed a penalty on a candidate for distributing alleged misinformation. That did not save it. "Although the state interest in protecting the political process from distortions caused by untrue and inaccurate speech is somewhat different from the state interest in protecting individuals from defamatory falsehoods, the principles underlying the First Amendment remain paramount." *Id.* at 61. In fact, a "candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent." *Id.* Thus, in the political process, "[t]he preferred First Amendment remedy of more speech, not enforced silence, [ ] has special force." *Id.* (cleaned up).

This case is no different. The fact that it involves a private party punishing people for disagreeing with the government only makes it more important. The Supreme Court was right: the internet *is* the "modern public square." *Packingham v. North Carolina*, -- U.S. --, 137 S. Ct. 1730, 1737 (2017); *see also Biden v. Knight First Amend. Inst.*, -- U.S. --, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring) (noting that internet platforms like YouTube "hold themselves out as organizations that focus on distributing the speech of the broader public"). It is where political debate occurs, where people get their news, where they decide how

to vote. That will only increase in the future. Allowing the companies that control the biggest parts of that square to silence the incumbent government's critics, based solely on the incumbent government's views, would set a dangerous precedent.

### C.   Google Is Not a Publisher, So It Will Not Suffer from Being Ordered Not to Remove Video of Kennedy's Political Speech.

These are not novel arguments. Justice Marshall, a champion of the state action doctrine, drew an important distinction between the limited nature of the private speech forum involved in *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), and the way the company used it.

In that case, the Supreme Court decided that the California government could not force PG&E, a private company, to give an opponent space in a newsletter that PG&E included in its billing statements. The Court emphasized that "because access is awarded only to those who disagree with appellant's views and who are hostile to appellant's interests, appellant must contend with the fact that whenever it speaks out on a given issue, it may be forced … to help disseminate hostile views." *Id.* at 14. The Court had no problem finding that regulation to violate the First Amendment. *Id.* But Justice Marshall explained that if PG&E were "to use its billing envelopes as a sort of community billboard, regularly carrying

the messages of third parties, its desire to exclude a particular speaker would be deserving of lesser solicitude." *Id.* at 23 (Marshall, J., concurring).

That is exactly what Google did with YouTube and why its desire to remove Mr. Kennedy's political speech after the fact does not deserve the protection the Supreme Court showed in *PG&E*, *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241 (1974), or *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995), the cases that Google cited below. Moreover, those cases were compelled speech cases and "[t]he compelled speech violation in each … resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006) ("*FAIR*"). But Google is *not* a publisher. Under section 230 of the Communications Decency Act, it cannot be held liable for the content its users publish. 47 U.S.C. § 230(c)(1). In fact, Congress enacted section 230 in response to a decision, *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), that deemed an internet platform, over its objection, to be akin to a newspaper because its content removal process "constitute[d] editorial control" over the platform. *See* H.R. REP. No. 104-458, at 194 (1996) ("One of the specific purposes of [section 230] is to overrule *Stratton-Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers….").

41

Moreover, Google does not engage in expressive activity when it allows people to post videos on YouTube. "Unlike newspapers," internet platforms like YouTube "exercise virtually no editorial control or judgment." *NetChoice*, 49 F.4th at 460. They use "algorithms to screen out certain obscene and spam-related content. And then virtually everything else is just posted to the Platform with zero editorial control or judgment." *Id.* That further distinguishes this situation from *Tornillo* and its progeny.

As Google admitted below, there are many videos of Kennedy speaking on YouTube about public health matters that the government disagrees with, and which therefore could be removed at any time, especially under Google's new medical misinformation policy. 6-ER-1216. Judge Thompson viewed that fact as weighing against Mr. Kennedy. In fact, it tilts the scales sharply in Kennedy's favor because it shows that Google acts arbitrarily when it removes videos (often the most popular ones) of Kennedy's political speech. Furthermore, Google does not have to censor Kennedy completely to violate his rights. In the current political environment, Mr. Kennedy needs *every* avenue open to him. Any video could go viral. Every video matters. Thus, the chilling effect from Google's actions hurts Kennedy's campaign. 6-ER-1216-17, 1221-23.

\ \ \

\ \ \

42

### D. The Public Interest in Having Open Dialogue During the Political Process Strongly Favors Granting Injunctive Relief.

That chilling effect gives Mr. Kennedy the personal interest needed to pursue this relief. *See Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984) (noting that "when there is a danger of chilling free speech, ... society's interest" in promoting speech outweighs prudential standing considerations that might otherwise require greater degree of harm to sue). And it tilts the public interest in favor of granting the preliminary injunction.

That should not be surprising. "The Ninth Circuit has consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *cf. Tunick v. Safir*, 209 F.3d 67, 95 (2d Cir.2000) (Sack, J., concurring) (explaining that courts should not "mak[e] unnecessary distinctions ... between speech that we find to be urgent and that which we think can bide its time"). Judge Thompson recognized that but held that the public interest favored denying relief because Kennedy's speech, which she described as "misinformation," might lead to more COVID illnesses and deaths. 1-ER-013.

Judge Thompson erred. The record contains no evidence that anything Mr. Kennedy said was false. In fact, the government has increasingly targeted Kennedy's speech not because it is false but because the government believes it is misleading or potentially harmful (something it calls "malinformation"). 6-ER-

1217-18. Even if that were a meaningful distinction (it still constitutes viewpoint discrimination), the record does not contain any evidence that Kennedy's speech, especially his political speech about public health policymaking, would cause any harm to anybody. Thus, Judge Thompson's concerns about the public health consequences of Kennedy's speech were, at best, speculative. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Speculative harm to the public should not be used to deny relief in an important First Amendment case where the balance of equities otherwise favors the plaintiff and justifies relief.

Judge Thompson also erred in denying the motion based on Mr. Kennedy's purported delay in seeking relief. Courts have repeatedly rejected such arguments when the injunctive relief would prevent a violation of First Amendment rights, reasoning that "[t]his rationale of denial due to delay is not applicable in the context of an alleged First Amendment violation where each passing day may constitute a separate and cognizable infringement on the First Amendment." *Dow Jones & Co. v. Kaye*, 90 F. Supp. 2d 1347, 1362 (S.D. Fla. 2000) (cleaned up); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (discussing this principle and noting that "courts are loath to withhold relief solely on that ground" (cleaned up)). Moreover, Mr. Kennedy provided a compelling reason for his

44

decision to seek injunctive relief now: unlike Facebook and Twitter, Google continued to censor his speech on matters of public concern during his political campaign and despite his repeated requests that they stop. 6-ER-1217-18.

The public interest demands the fullest protection for free speech. That is especially true during this cycle, in what will be one of the most important elections in American history. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940). It does not matter that Kennedy's political speech often references COVID-19, which Judge Thompson said "still poses a health risk to certain individuals …." 1-ER-013. "'They that can give up essential liberty to obtain a little safety deserve neither liberty nor safety.'" *United States v. Kincaide*, 379 F.3d 813, 842 (9th Cir. 2004) (en banc) (Reinhardt, Pregerson, Kozinski and Wardlaw, JJ., dissenting) (quoting B. Franklin, *Historical Review of Pennsylvania* (1759)).

It is time for this Court to return to its roots, to apply the state action doctrine flexibly, and to enjoin Google from using its government-induced and government-dependent medical misinformation policy to remove videos of Mr. Kennedy's political speech during his presidential campaign.

\ \ \

45

### E.    The Court Should Decide this Appeal as Quickly as Possible.

Time is of the essence. "There are short timeframes in which speech can have influence." *Citizens United v. F.E.C.*, 558 U.S. 310, 334 (2010). That is especially true in the political process. "The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others. A speaker's ability to engage in political speech that could have a chance of persuading voters is stifled if the speaker must first commence a protracted lawsuit." *Id.*

So here. Some people would like to forget the COVID-19 pandemic. They want to treat it as a historical anomaly, a once-in-a-century event that won't be repeated. Others, like Mr. Kennedy, feel otherwise. They saw government and corporations manipulate the pandemic to increase their power and enrich themselves while destroying small businesses and trampling civil liberties. 6-ER-1218. They saw the government's COVID-19 response, which included shutting down the global economy and then spending trillions of dollars to try to turn it back on at the right time, as the biggest public policy blunder in history. *Id.* They saw billions of dollars in taxpayer money wasted on ineffective, and potentially unsafe, vaccines. *Id.* They saw children's lives set back by the unprecedented and unnecessary forced closure of schools. *Id.*

Public health officials supported those failed policies. How can America recover from the pandemic without questioning the public health orthodoxy? Moreover, Google's amended medical misinformation policy shows that the company does not view COVID-19 as an isolated emergency that briefly required the censorship of dissent. It prohibits the discussion of many topics that, while involving health, are also matters of public and political concern.

Thus, the Court should act quickly. *Biden* has already reached the Supreme Court and will be argued next spring. Several other social media related First Amendment cases, including the *NetChoice* cases, will also be decided by the Supreme Court this term. This case should join them.

## CONCLUSION

Therefore, the Court should reverse the District Court's order and grant the requested preliminary injunction.

Respectfully submitted,

Date: December 6, 2023

JW HOWARD/ATTORNEYS, LTD.

*s/ Scott J. Street*
Scott J. Street

*Attorneys for Robert F. Kennedy, Jr.*

47

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)** 23-3411

The undersigned attorney or self-represented party states the following:

[ x ]   I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Scott J. Street          **Date:** December 6, 2023

48

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 23-3411

I am the attorney or self-represented party.

**This brief contains 10,663 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Scott J. Street      **Date** December 6, 2023

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On December 6, 2023, I electronically filed the **APPELLANT'S OPENING BRIEF** and served the documents using the Court's Electronic CM/ECF Service which will send electronic notification of such filing to all registered counsel.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on December 6, 2023 at San Diego, California.

*/s/ Dayna Dang* _
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com