Case No. 23-3411

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

────────────

ROBERT F. KENNEDY, JR.,
*Plaintiff-Appellant,*
*vs.*
GOOGLE LLC;
YOUTUBE, LLC,
*Defendants-Appellees.*

────────────

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-CV-03880-TLT
Hon. Trina L. Thompson

────────────

## RESPONSE BRIEF OF DEFENDANTS-APPELLEES

────────────

Jonathan H. Blavin
Juliana M. Yee
Carson Scott
MUNGER, TOLLES & OLSON LLP
  560 Mission St.
  27th Floor
  San Francisco, CA 94105
  Telephone: (415) 512-4000

Ginger D. Anders
Donald B. Verrilli, Jr.
Helen E. White
MUNGER, TOLLES & OLSON LLP
  601 Massachusetts Ave. NW
  Suite 500 E
  Washington, DC 20001
  Telephone: (202) 220-1100
  Ginger.Anders@mto.com

*Attorneys for Defendants-Appellees Google LLC and YouTube, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellees Google LLC and YouTube, LLC state as follows:

1. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

2. YouTube, LLC is a subsidiary of Google LLC, which is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet, Inc.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT .......................................................................4

STATEMENT OF THE ISSUE ..............................................................................4

STATEMENT OF THE CASE ...............................................................................4

    A.    Factual Background...................................................................................4

          1.    Google's and YouTube's medical misinformation policies ........................................................................................4

          2.    Google's 2021 interactions with the federal government concerning COVID-19 vaccine misinformation.........................8

          3.    Google's removal, two years later and pursuant to its longstanding policies, of videos of Kennedy ...........................11

    B.    Procedural History...................................................................................12

SUMMARY OF ARGUMENT ...............................................................................18

STANDARD OF REVIEW ......................................................................................21

ARGUMENT ............................................................................................................21

I.      THE DISTRICT COURT CORRECTLY HELD THAT KENNEDY IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS FIRST AMENDMENT CLAIMS AGAINST GOOGLE. .........................................21

    A.    Supreme Court and Ninth Circuit precedent establish that the situations in which a private party can be held to be a state actor are extremely narrow..........................................................22

    B.    Google does not exercise any right or privilege created by the state when moderating content on YouTube.......................................25

    C.    Google was not a state actor when it developed its content moderation policies and, years later, removed videos of Kennedy from YouTube.................................................................27

          1.    Google does not perform a traditional, exclusive public function in maintaining the YouTube platform. ......................27

          2.    Kennedy cannot meet the "demanding" standard of the nexus test....................................................................................29

      3.     Kennedy cannot satisfy the joint action test. ............................39

II.    KENNEDY HAS NOT SHOWN THAT HE WILL SUFFER IRREPARABLE HARM. ...............................................................46

III.   THE BALANCE OF EQUITIES WEIGHS POWERFULLY AGAINST GRANTING A PRELIMINARY INJUNCTION. .....................48

IV.   THE PUBLIC INTEREST FAVORS DENYING A PRELIMINARY INJUNCTION.....................................................................52

CONCLUSION ......................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*All. For the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) .................................................................13, 32, 48

*Am. Hotel & Lodging Ass'n v. City of Los Angeles,*
834 F.3d 958 (9th Cir. 2016) .................................................................21

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999) .................................................................25, 40

*AMA Multimedia, LLC v. Wanat,*
970 F.3d 1201 (9th Cir. 2020) .................................................................31

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) .................................................................30

*Blum v. Yaretsky,*
457 U.S. 991 (1982) ........................................... 14, 19, 29, 30, 31, 33, 34, 37, 39

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,*
531 U.S. 288 (2001) .................................................................24, 25, 40

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.,*
827 F.2d 1291 (9th Cir. 1987) .................................................................52

*Changizi v. Dep't of Health & Hum. Servs.,*
82 F.4th 492 (6th Cir. 2023) .................................................................38

*CTIA – The Wireless Ass'n v. City of Berkeley,*
928 F.3d 832 (9th Cir. 2019) .................................................................47

*Denver Area Ed. Telecomms. Consortium, Inc. v. FCC,*
518 U.S. 727 (1996) (Thomas, J., concurring in the judgment in
part and dissenting in part).................................................................46

*Doe v. Harris,*
772 F.3d 563 (9th Cir. 2014) .................................................................46

*Doe v. San Diego Unified School District*,
19 F.4th 1173 (9th Cir. 2021) ...............................................................53

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ................................................................13

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ...............................................................47

*Goldie's Bookstore, Inc. v. Superior Court*,
739 F.2d 466 (9th Cir. 1984) ...............................................................46

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995).............................................................49, 50, 51

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974).................................................................22, 40

*Kennedy v. Google LLC*,
No. 23-16141 (9th Cir. Sept. 20, 2023) ...............................................17

*Kennedy v. Warren*,
66 F.4th 1199 (9th Cir. 2023) ..............................................................33

*Lee v. Katz*,
276 F.3d 550 (9th Cir. 2002) ...........................................................27, 29

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982)............................................ 2, 14, 15, 19, 22, 24, 25, 26, 27

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019)..................................................................passim

*Mathis v. Pac. Gas & Elec. Co.*,
75 F.3d 498 (9th Cir. 1996) .....................................20, 26, 40, 41, 43

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974).................................................................2, 48, 50, 51

*Missouri v. Biden*,
83 F.4th 350 (5th Cir. 2023) .........................................................37, 38

*Missouri v. Biden*,
   No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4, 2023),
   aff'd in part, rev'd in part, No. 23-30445, 83 F.4th 350 (5th Cir.
   Oct. 3, 2023) .................................................................................8, 38

*Moody v. NetChoice, LLC*,
   No. 22-277, 2023 WL 6319654 (U.S. Sept. 29, 2023).......................50

*Murthy v. Missouri*,
   No. 23-411, 2023 WL 6935337 (U.S. Oct. 20, 2023) ..................37, 39

*NetChoice, LLC v. Paxton*,
   49 F.4th 439 (5th Cir. 2022) ............................................................50

*NetChoice, LLC v. Paxton*,
   No. 22-555, 2023 WL 6319650 (U.S. Sept. 29, 2023).......................50

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023) ....................................................passim

*Oakland Trib., Inc. v. Chron. Publ'g Co.*,
   762 F.2d 1374 (9th Cir. 1985) ..........................................................47

*Pasadena Republican Club v. Western Justice Center*,
   985 F.3d 1161 (9th Cir. 2021) .....................................................24, 43

*Prager Univ. v. Google LLC*,
   951 F.3d 991 (9th Cir. 2020) .......................................1, 19, 21, 28, 29

*Rawson v. Recovery Innovations, Inc.*,
   975 F.3d 742 (9th Cir. 2020) .................................................40, 42, 44

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020)..........................................................................13

*Sammartano v. First Jud. Dist. Ct.*,
   303 F.3d 959, 974 (9th Cir. 2002) ....................................................52

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ..........................................................48

*Tsao v. Desert Palace, Inc.*,
   698 F.3d 1128 (9th Cir. 2012) .....................................................40, 41

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994)..................................................................49, 50

*Washington v. U.S. Dep't of State*,
    996 F.3d 552 (9th Cir. 2021) ...............................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 22 (2008)...........................................................13, 52

**FEDERAL STATUTES**

28 U.S.C. § 1291 .............................................................................4

28 U.S.C. § 1331 .............................................................................4

47 U.S.C. § 230 .................................................................10, 11, 34, 50

**OTHER AUTHORITIES**

Stern & Gressman, *Supreme Court Practice* § 6.31(E)...........................39

## INTRODUCTION

In this case, Plaintiff-Appellant Robert F. Kennedy Jr. advances the untenable claim that Defendants-Appellees Google LLC and video-sharing platform YouTube, LLC (collectively, "Google"), violated the First Amendment by removing from YouTube videos that propagated misinformation about COVID-19 vaccines. Google, of course, was exercising its own First Amendment editorial rights when it concluded that the videos violated YouTube's independently-developed COVID-19 vaccine misinformation policies. But Kennedy argues that instead of implementing its own editorial discretion, Google was acting as the federal government's catspaw. Kennedy has, however, offered no evidence that the federal government played *any* role in Google's decision to remove the videos, much less that the government forced Google to do so, or otherwise commandeered Google's exercise of editorial judgment. The district court was therefore correct to reject as baseless Kennedy's request for a preliminary injunction ordering Google to reinstate and disseminate the Kennedy videos. This Court should do the same.

On the merits, Kennedy's First Amendment claim is not only unlikely to succeed; it is not even colorable. This Court has consistently held that online platforms do not engage in state action when they exercise their own judgment in removing content from their platforms. *E.g.*, *O'Handley v. Weber*, 62 F.4th 1145, 1157 (9th Cir. 2023); *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir.

2020). That result is compelled by longstanding Supreme Court precedent, which holds that courts must rigorously enforce the fundamental distinction between actions by the state—which are subject to First Amendment constraints—and actions by private parties—which are not. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019); *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 937 (1982). Otherwise, private parties who "open their [platforms] for speech would be subject to First Amendment constraints and would lose the ability to exercise what they deem to be appropriate editorial discretion within that open forum." *Halleck*, 139 S. Ct. at 1931. That principle applies with particular force here. Kennedy's requested injunction would compel a private entity to disseminate third-party expression against its will—a compulsion that the Supreme Court has repeatedly held violates the First Amendment. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

For those reasons, this Court and the Supreme Court have held that private entities may be deemed to act as an arm of the government only in the rarest of circumstances. The entity's independent judgment must be so overborne by the government, or its challenged actions so deeply intertwined with the government, that the government has effectively dictated the private entity's conduct. Nothing that comes even close to satisfying that demanding standard is present here. Google independently developed YouTube's challenged medical misinformation policies

long before the government contacts that Kennedy has identified, and it removed the videos of Kennedy two years after those contacts.  And the government contacts on which Kennedy relies involved nothing more than sporadic exchanges of general public health information and a presidential exhortation to all online platforms to address COVID-19-related misinformation.  Permitting such routine consultation and general presidential persuasion to transform a private company into a state actor would vastly and impermissibly "expand governmental control while restricting individual liberty and private enterprise," a result that could hardly be more antithetical to the guarantees of the First Amendment.  *Halleck*, 139 S. Ct. at 1934.

The district court also correctly concluded that the equities weigh strongly against injunctive relief.  Kennedy presented no evidence of irreparable harm, and Kennedy's five-month delay in seeking relief belies any such claim.  The balance of equities weighs against an injunction because the requested relief would deprive Google of its First Amendment rights, causing *it* irreparable harm.  For similar reasons, the public interest weighs heavily against an injunction:  the vaccine misinformation that Kennedy seeks to force Google to disseminate poses significant public health risks.

The district court thus did not abuse its discretion when it denied Kennedy's request for a preliminary injunction.  This Court should affirm.

3

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. The district court denied Kennedy's motion for a preliminary injunction during the hearing held on that motion on November 7, 2023. 1-ER-007. Kennedy timely filed his notice of appeal the following day. 1-ER-002. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in denying Kennedy's motion for a preliminary injunction on the grounds that (1) Kennedy could not show that he was likely to establish that Google, a private company, acted as an arm of the federal government for First Amendment purposes in removing videos of Kennedy for propagating COVID-19 vaccine misinformation, and (2) Kennedy could not establish irreparable harm or that equitable considerations weighed in favor of injunctive relief.

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    Google's and YouTube's medical misinformation policies

Google's subsidiary, YouTube, is a popular video-sharing platform. 5-ER-1059. YouTube has policies that govern how people can use the service, including restrictions on the types of content that they can post. 5-ER-0982 ¶¶ 4–5. These

policies are designed to make YouTube a safer place for users and creators. 5-ER-0986–0987.

Google enforces its content moderation policies by removing content that violates those policies from YouTube. *E.g.*, 5-ER-1056. Under YouTube's medical misinformation policy, Google may remove "content [from YouTube] that poses a serious risk of egregious harm by spreading medical misinformation that contradicts local health authorities' (LHAs) or the World Health Organization's (WHO) guidance about specific health conditions and substances." 5-ER-1052. This includes content about COVID-19 and about "the safety, efficacy or ingredients of currently approved and administered vaccines," including the COVID-19 vaccine. 5-ER-1052. Google retains discretion and ultimate decision-making authority over whether and when to remove material. 5-ER-1056. The misinformation policies in place at the time Kennedy filed this action were materially similar, although they were split into a COVID-19 medical misinformation policy, 5-ER-1047, and a more general vaccine misinformation policy, 5-ER-1043.

Although Kennedy insinuates that Google's removal of his speech pursuant to its COVID-19 misinformation policy represents politically motivated targeting by the Biden Administration, Br. 4; 6-ER-1235, Google's efforts to limit the spread of medical misinformation on YouTube pre-date the Biden Administration and even

5

the COVID-19 pandemic.[1]  Since July 2019, Google's Community Guidelines have prohibited videos featuring medical misinformation.  5-ER-0982, ¶ 7; 5-ER-0989–0994.  And Google first published a COVID-19 medical misinformation policy in May 2020, shortly after the pandemic began and well before President Biden was elected.  *See* 5-ER-0982–0983, ¶ 8.  That policy—like the medical misinformation policy in force today—prohibited content that "poses a serious risk of egregious harm" and "contradicts the World Health Organization (WHO) or local health authorities' medical information about COVID-19."  5-ER-0996.

To offer users greater guidance about the kinds of content that may be removed pursuant to the policy, the policy also provides a list of "examples of content that's not allowed on YouTube."  5-ER-0996.  In May 2020, this list included, for example, "[c]laims that people have not died from COVID-19," "[c]laims that there's a guaranteed vaccine for COVID-19," and "[c]laims that certain people have immunity to COVID-19 due to their race or nationality."  5-ER-0996.

---

[1] Kennedy misleadingly asserts that a "timeline" showing that Google adopted its relevant medical misinformation policies well before President Biden's inauguration was introduced for the first time during the hearing on the motion for a preliminary injunction.  *See* Br. 7 n.1.  Kennedy fails to mention the declaration from Alexandra Veitch, the Director of YouTube Government Affairs & Public Policy for the Americas, which Google submitted alongside its opposition to the motion for preliminary injunction.  That declaration detailed the evolution of Google's medical misinformation policies and contained all of the information that Google reproduced in a timeline document used as a demonstrative exhibit in the hearing.  5-ER-0981.

As new false and dangerous claims proliferated throughout 2020, Google frequently updated its COVID-19 medical misinformation guidance with additional examples of prohibited content. 5-ER-0983, ¶ 9. In October 2020, for instance, Google updated its guidance to make clear that the policy prohibited "[c]laims about COVID-19 vaccinations that contradict expert consensus from local health authorities or WHO." 5-ER-0983, ¶ 10; 5-ER-0999 (October 2020 policy). In December 2020, as the first COVID-19 vaccines were being administered, Google added a number of examples of vaccine misinformation claims that could be removed pursuant to the policy. *See* 5-ER-0983, ¶ 11; 5-ER-1002 (December 2020 policy) (prohibiting, for example, "[c]laims that an approved COVID-19 vaccine will cause death").

Google actively enforced this policy. By October 2020, Google had already removed more than 200,000 videos from YouTube "related to dangerous or misleading Covid-19 information." 2-ER-137; *see* 2-ER-142 (by August 2021, Google had removed over one million "videos related to dangerous coronavirus information [from YouTube]").

In September 2021, Google updated its medical misinformation guidance to expand its existing COVID-19 vaccine policies to all vaccines. 5-ER-1129 (new policy covers misinformation on "currently administered vaccines that are approved and confirmed to be safe and effective"). The addition of the vaccine misinformation

7

policy did not materially alter Google's existing *COVID-19* vaccine misinformation guidance, which continued to prohibit "[c]laims about COVID-19 vaccinations that contradict expert consensus from local health authorities or WHO." 5-ER-983–984. The September 2021 "vaccine misinformation policy" expanded that basic framework to all "currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO)." 5-ER-1005 (September 2021 Policy).

### 2. Google's 2021 interactions with the federal government concerning COVID-19 vaccine misinformation

Kennedy's First Amendment claim rests principally on evidence that, nearly two years after Google first introduced YouTube's medical misinformation policy and nearly a year after it updated its guidance to prohibit COVID-19 misinformation, Google employees met with representatives of the Executive Office of the President, the Centers for Disease Control and Prevention ("CDC"), and the Office of the Surgeon General ("OSG") to discuss the proliferation of misinformation concerning COVID-19.[2]  5-ER-1083–1151.   Kennedy's exhibits identify the following

---

[2] These communications were originally produced in *Missouri v. Biden*, No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4, 2023), *aff'd in part, rev'd in part*, No. 23-30445, 83 F.4th 350 (5th Cir. Oct. 3, 2023), a suit involving allegations that government-compelled content moderation decisions of several online platforms violated the First Amendment. *See* pp. 37-39, *infra*.  Kennedy placed the documents into the record of this case when he sought a temporary restraining order.

interactions between government officials and Google concerning Google's ongoing efforts to combat medical misinformation on YouTube.

In April 2021, a White House official named Rob Flaherty emailed Google to request that it share information regarding its ongoing efforts to combat misinformation. 5-ER-1084. Flaherty asked about the "top trends that [Google was] seeing in terms of misinformation" and the effectiveness of various "interventions" Google already had implemented. 5-ER-1084. He made clear that the government was not requesting, much less requiring, that Google remove any content: "We certainly recognize that removing content that is unfavorable to the cause of increasing vaccine adoption is not a realistic—or even good—solution." 5-ER-1084.

Also around this time, Google and other online platforms met with the CDC to discuss COVID-19 misinformation. CDC official Carol Crawford testified that there were only two such meetings, each of which lasted about twenty minutes. 3-ER-346, 414. She further testified that no one at the CDC "craft[ed] the content policy" of "any . . . social media company" or even "g[ave] input on what such a policy should look like," 2-ER-250–251, let alone "help[ed] any . . . social media company on how they should apply their policies . . . toward a particular post," 2-ER-252.

In July 2021, the United States Surgeon General issued an "Advisory" on COVID-19 misinformation, which called on "all Americans" to "help slow the

9

spread of health misinformation." 5-ER-1191. At the same time, Google and government officials in the Surgeon General's office exchanged information about Google's previously-implemented policies for combatting misinformation on YouTube. *See* 5-ER-1088 (meeting with Google and Surgeon General's office for "YouTube/Google . . . to share more of the work it *was doing* around health mis- and disinformation." (emphasis added)); 5-ER-1126 (Surgeon General's office representative acknowledging that Google had been "working hard and thinking deeply about [the COVID-19 misinformation] issue"). OSG Official Eric Waldo, who attended those meetings, testified that Google had not undertaken any "new things" in response to the Surgeon General's Advisory, but had instead simply continued on with "work that they were *already doing*" on misinformation. 5-ER-1096 (emphasis added).

Also in July 2021, a White House spokesperson stated in the press that the Administration was "reviewing" potential changes to the immunity conferred on platforms by Section 230 of the Communications Decency Act. 5-ER-1218. That statute provides immunity to online platforms for certain claims based on third-party speech that appears on the platforms. 47 U.S.C. § 230. Around the same time, President Biden publicly commented that misinformation on Facebook was "killing people," 5-ER-1213. In conjunction with these comments, President Biden stated that he was not "trying to hold [platforms] accountable." 5-ER-1214. His press

10

secretary added that it was "up to Congress to determine how . . . to proceed" with respect to any changes to Section 230.  5-ER-1215.

None of these communications specifically mentioned Kennedy or any of his content, let alone the videos at issue here.

### 3. Google's removal, two years later and pursuant to its longstanding policies, of videos of Kennedy

Nearly two years after all of the communications in the record between government officials and Google employees, Google removed a handful of videos of Kennedy from YouTube.  One removed video featured Kennedy speaking at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") and was posted by Manchester Public Television in March 2023, 5-ER-1024, ¶ 5.  The NHIOP video was removed for violating YouTube's policies on "Covid-19 vaccine misinformation."  5-ER-1037.

Google also removed videos of Kennedy's interviews with Jordan Peterson, Joe Rogan, and a former New York Post reporter that had been posted by unidentified users, in June 2023, 6-ER-1226, ¶ 4.  Google concluded that the video of Kennedy's appearance on Joe Rogan's podcast violated Google's "medical misinformation policy," because it included "claims about COVID-19 vaccinations that contradict expert consensus."  6-ER-1232.  In the interview with Joe Rogan, Kennedy repeated claims that "if you take the [COVID-19] vaccine, you're 21% more likely to die [over the next six months]." 2-ER-073.  Kennedy does not identify

reasons the other two videos were removed, or any other details regarding those videos.

The record does not contain any evidence or allegation that Google employees communicated with government officials about any of these videos.

### B. Procedural History

1.     On August 2, 2023, five months after his NHIOP speech was removed from YouTube, and almost four months after declaring his candidacy for President, Kennedy filed this suit, alleging that Google had violated his First Amendment rights by removing the videos.  In his initial complaint, Kennedy alleged that YouTube "violated [his] First Amendment rights when it removed videos of his political speech."  Dkt. 1 (Compl. ¶ 34).  Kennedy further alleged that Google's medical misinformation policy "violate[s] the First Amendment on [its] face because [it is] overbroad and vague."  *Id.* (Compl. ¶ 42).  Kennedy acknowledged that "YouTube is a private (non-governmental) party," *id.* (Compl. ¶ 34), but asserted that under the state action doctrine, "there is a sufficiently close nexus between YouTube and the federal government such that YouTube's actions may be fairly treated as that of [the] government itself," *id.* (Compl. ¶ 35).

Kennedy sought an injunction to "restore any videos of Mr. Kennedy's political speech that [Google] has removed during the 2024 presidential campaign," as well as a declaration that Google's medical misinformation policies are

unconstitutional.  *Id.* (Prayer for Relief ¶ 2).  A week later, Kennedy filed an application for a temporary restraining order seeking to bar Google from using its medical misinformation policies "to remove videos of Mr. Kennedy's speech from YouTube . . . pending a trial on the merits."  Dkt. 7-4 at 2.

2.      After a hearing, the district court denied Kennedy's application for a temporary restraining order and his request for expedited discovery.  1-ER-019.

The district court first explained that to obtain a TRO, Kennedy was required to demonstrate that he was likely to succeed on the merits, likely to suffer irreparable harm, that the balance of equities tips in his favor, and that the injunction is in the public interest.  1-ER-010–011 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The court also observed that alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff" could support the issuance of a TRO, if the other factors were satisfied.[3]  1-ER-011 (quoting *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

---

[3] Kennedy observes that "the parties disputed which of those tests [for injunctive relief] appl[ies] here," with Kennedy relying on the "serious questions" standard and Google relying on the *Winter* standard.  Br. 17–18.  That dispute is not material because the district court acknowledged both standards and thus effectively held that Kennedy was not entitled to a TRO under either standard.

Google notes, however, that the Supreme Court has consistently applied the *Winter* test in evaluating all requests for preliminary injunctive relief, including in First Amendment cases.  *See, e.g., Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020).  This Court has nonetheless continued to state in some cases that a movant need only raise "serious questions [going to] the merits" if the "balance of equities tips sharply in the plaintiff's favor."  *Fellowship of Christian Athletes v.*

The district court held that Kennedy was not entitled to a TRO, primarily because Kennedy could not establish that Google likely should be deemed a state actor for purposes of the First Amendment. The district court applied the state-action framework set forth in *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 937 (1982), pursuant to which the plaintiff must first show that the alleged constitutional violation was caused by the exercise of a state-created right or imposition of a state rule of conduct, and then must show that the defendant "may fairly be said to be a state actor." 1-ER-012. For purposes of the latter inquiry, courts apply "four different tests . . . to determine the answer"; Kennedy relied on the "nexus" and "joint action" tests. *Id*. Under the nexus test, Kennedy was required to show that the government had exercised coercive power over Google or "provided such significant encouragement . . . that the choice must in law be deemed to be that of the state." *Id*. (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). And under the joint action test, Kennedy was required to prove the existence of a conspiracy or a high degree of interdependence between Google and the government. 1-ER-013.

Applying those standards, the district court held that Kennedy had failed to "mak[e] a colorable claim that [his] First Amendment rights have been infringed[]

*San Jose Unified Sch. Dist. Bd. of Educ*., 82 F.4th 664, 684 (9th Cir. 2023). For the reasons discussed below, Kennedy cannot establish on appeal either that the balance of equities tips sharply in his favor, or that there are serious questions going to the merits.

by way of a state actor." 1-ER-016. The court first held that Kennedy had not shown that Google removed videos of Kennedy's speech "pursuant to a state-created right" under *Lugar*. *Id.* The court next explained that under *O'Handley v. Weber*, 62 F.4th at 1160, Kennedy faced significant hurdles in establishing state action. In *O'Handley*, the court observed, this Court held that Twitter's election-related content moderation decisions did not constitute state action, even though the content in question was removed pursuant to a partnership between Twitter and the state government in which public officials flagged posts for expedited removal, because Twitter exercised its independent judgment in removing the flagged posts. "As in *O'Handley*," the district court reasoned, "Google and YouTube removed Plaintiff's videos based on its content moderation and COVID-19 medical misinformation policy as permitted under the terms of service." 1-ER-015.

Turning to Kennedy's proffered evidence of communications between Google and the government, the court found that all of the interactions merely "concern[ed] requests for information to YouTube about trends related to vaccine misinformation and YouTube seeking information." 1-ER-015. As a result, the court concluded, "[t]here is no evidence . . . that any of the identified government officials . . . demanded that Google adopt a COVID-19 medical misinformation or vaccine misinformation policy." 1-ER-015. Referring to the requirements of the nexus and joint action tests, respectively, the court explained the evidence provided in support

15

of Kennedy's application "does not show that the government coerced Google" (which Kennedy conceded below) or that it "provided such significant encouragement" to Google that Google's actions should be thought of as those of the government, 1-ER-014; and that Kennedy had not shown that the government "insinuated itself into a position of interdependence" with Google. 1-ER-014. In addition, the court observed, "there is no evidence . . . that government officials communicated with Google regarding Kennedy at all." 1-ER-015.

The court next held that Kennedy had not demonstrated irreparable harm because his only basis for asserting irreparable harm was the alleged deprivation of his First Amendment rights. The court also found that Kennedy's assertion that his campaign was harmed by the videos' removal was purely "[a]bstract" and speculative, and that any claims of harm were further undermined by Kennedy's failure to seek a temporary restraining order until months after the removal of his videos. 1-ER-016. Finally, the court found that the equities were "balanced" and thus gave the tie to Kennedy; and that the public interest would not be served by allowing medical misinformation to "proliferate" on YouTube. 1-ER-017–018.

3. Following the district court's denial of the temporary restraining order, Google moved to dismiss the initial complaint, Dkt. 37, prompting Kennedy to file an amended complaint, *see* 6-ER-1234. The amended complaint re-asserts Kennedy's First Amendment claim, and adds a claim for "Declaratory Relief under

Article I, sec. 2 of [the] Cal. Constitution/*Pruneyard*." 6-ER-1251. Google has since moved to dismiss the amended complaint for failure to state a claim. That motion is fully briefed and is scheduled to be heard on January 16, 2024.

At the same time, Kennedy sought this Court's review of the district court's denial of the temporary restraining order. *Kennedy v. Google LLC*, No. 23-16141 (9th Cir. Sept. 20, 2023). This Court dismissed the appeal for lack of jurisdiction, mooting his motion for injunctive relief pending appeal. *Id.*

4. On September 25, 2023, Kennedy filed a motion for a preliminary injunction, relying on largely the same arguments and evidence submitted in support of his TRO motion. Dkt. 49. Kennedy attached only four new exhibits to his preliminary injunction motion, three of which are news articles from the summer of 2021 reporting on public statements by the Biden Administration officials that were largely directed at Facebook, *e.g.*, 5-ER-1213; *see* p. 10, *supra*. The fourth new exhibit was a copy of the U.S. Surgeon General Advisory regarding Health Misinformation that was referenced in documents submitted in support of Kennedy's unsuccessful motion for a temporary restraining order, 5-ER-1190. Kennedy's motion for a preliminary injunction did not mention his California state constitutional claim. *See generally* Dkt. 49 at 17-30.

On November 7, 2023, at the conclusion of a hearing, the district court denied Kennedy's preliminary injunction motion. 6-ER-1368. The court explained that

Kennedy's "First Amendment claim fails . . . as Google has not been established as a state actor." 2-ER-066. The district court explained that it would not issue a written opinion because "[a]ll of the cases previously recited by the Court" in the order denying the temporary restraining order "stand for that position and it would be redundant . . . for the Court to issue the same order a second time." 2-ER-066. The court found that "there's no coercion," that the "information that I reviewed does not show any entanglement" or "government inducement," and that the record "falls very short of any direct involvement by the Government." 2-ER-066.

## SUMMARY OF ARGUMENT

The district court acted well within its discretion in holding that Kennedy is not entitled to a preliminary injunction. To succeed on his First Amendment claims, Kennedy would need to meet the exceedingly high bar of showing that Google acted as an arm of the government in adopting the challenged misinformation policies and enforcing them against Kennedy. Google is a *private* entity with its own First Amendment rights, and it exercises those rights when it makes editorial choices about what content should be allowed to remain on YouTube. For precisely that reason, the Supreme Court has held that broad theories of state action like Kennedy's are "especially problematic in the speech context," and private entities should be deemed to be acting with the authority of the state only in rare circumstances. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928-32 (2019).

I. Kennedy cannot demonstrate the presence of those rare circumstances. First, Kennedy cannot satisfy the threshold requirement for demonstrating that Google engaged in state action: in adopting its COVID-19 misinformation policy and enforcing the policy against Kennedy, Google was not exercising any "right or privilege created by the State," or enforcing a state-imposed rule of conduct. *Lugar*, 457 U.S. at 937.

Second, Kennedy cannot demonstrate that Google may "fairly be said to be a state actor," *id*., under the tests that the Supreme Court and this Court have applied to determine whether the private entity is effectively acting with the authority of the government. Google is obviously not performing a traditional, exclusive public function in moderating content on YouTube, as this Court has already held. *See Prager*, 951 F.3d at 998. Nor can Kennedy show that Google is a state actor under either the nexus or joint action tests. Kennedy points to nothing more than a few isolated press statements and a few interactions between Google and the government in 2021 in which the government sought information on Google's ongoing efforts to stem misinformation, beginning *months* after Google had adopted its COVID-19 misinformation policies and ending almost *two years* before Google removed the Kennedy videos. Those interactions fall far short of the level of coercion or significant encouragement necessary to establish that Google's choices "must in law be deemed to be th[ose] of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

Nor do those sporadic interactions suggest that Google's adoption of its challenged policies or removal of Kennedy's speech were "inextricably intertwined" with government actions, as would be necessary to satisfy the joint action test. *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996). Google made its own independent decisions about what content to remove—full stop. For those reasons, Kennedy's First Amendment claims fail: Google acted as a private entity, not an arm of the federal government.

II. Kennedy also cannot demonstrate irreparable harm. His primary claim of irreparable harm is that he was deprived of his First Amendment rights—but that claim fails for the reasons stated above. The district court also correctly found that Kennedy's claim that the removal of the videos affected his campaign was unsupported by any evidence and therefore too "[a]bstract" and "[s]peculative" to support an injunction. 1-ER-016. And Kennedy's months-long delay in filing this suit undermines any claim of irreparable injury stemming from the removal of his videos.

III. The balance of equities weighs heavily in Google's favor. While Kennedy has not demonstrated any cognizable harm from the removal of his videos, an injunction would violate *Google's* First Amendment rights by requiring it to host and disseminate information that it has concluded is harmful to its users and should not be available on its platform.

IV.    Finally, an injunction forcing Google to host dangerous vaccine misinformation would not be in the public interest.

**STANDARD OF REVIEW**

This Court reviews the district court's denial of a preliminary injunction for abuse of discretion.  *E.g.*, *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 962 (9th Cir. 2016).  The district court's factual findings are reviewed for clear error, and its legal conclusions are reviewed de novo.  *Washington v. U.S. Dep't of State*, 996 F.3d 552, 560 (9th Cir. 2021).

**ARGUMENT**

**I.    THE DISTRICT COURT CORRECTLY HELD THAT KENNEDY IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS FIRST AMENDMENT CLAIMS AGAINST GOOGLE.**

Kennedy's First Amendment claim faces an insurmountable hurdle:  Google is a private company, not the government.  As the Supreme Court recently explained, the "text and original meaning" of the First Amendment, as well as the Supreme Court's "longstanding precedents, establish that the Free Speech Clause prohibits only *governmental* abridgment of speech."  *Halleck*, 139 S. Ct. at 1928.  At the threshold, then, Kennedy must establish that this is one of the "exceptional cases" in which a private party may be deemed a "state actor" bound by the Constitution.  *O'Handley*, 62 F.4th at 1155.  He cannot do so.  This Court has consistently refused to treat online platforms' content moderation decisions as state action.  *Id.*; *Prager Univ.*, 951 F.3d at 996.  There is no reason for a different result here.  As the district

21

court correctly held, Kennedy's evidence "falls very short" of establishing any likelihood that he will be able to demonstrate state action, or even that he has raised serious questions to that effect. 2-ER-066.

### A. Supreme Court and Ninth Circuit precedent establish that the situations in which a private party can be held to be a state actor are extremely narrow.

The Constitution is founded on an "essential dichotomy" between governmental action, against which it provides individuals with protection, and private action, against which it "offers no shield." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974). The Supreme Court has rigorously enforced that dichotomy, explaining that "the state-action doctrine enforces a critical boundary between the government and the individual, and thereby protects a robust sphere of individual liberty." *Halleck*, 139 S. Ct. at 1934; *Lugar*, 457 U.S. at 936 ("[C]areful adherence to the 'state action' requirement preserves an area of individual freedom."). Treating a private entity as a state actor significantly restrains that entity's liberty: the constitutional constraints that apply to the government are extended to the private entity, depriving it of the ability to act freely and essentially conscripting its operations for public use. *Halleck*, 139 S. Ct. at 1931. The Supreme Court has therefore guarded against broadening the conception of state action "beyond its traditional boundaries." *Id.* at 1934.

The Supreme Court has been especially reluctant to find that a private entity is a state actor when the entity's challenged actions implicate the private entity's own First Amendment rights. In *Halleck*, for instance, the plaintiffs alleged that a private cable operator had acted as an arm of the state in disallowing certain programming on the operator's public-access channel, thereby violating the First Amendment. 139 S. Ct. at 1927. The Supreme Court rejected that argument, explaining that "hosting speech by others . . . does not alone transform private entities into state actors subject to First Amendment constraints." *Id*. at 1930. Were it otherwise, the Court emphasized, "all private property owners and private lessees who open their property for speech would be subject to First Amendment constraints and would lose the ability to exercise what they deem to be appropriate editorial discretion within that open forum." *Id*. at 1930-31. Accepting broad theories of state action therefore is "especially problematic in the speech context, because it could eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms." *Id*. at 1932.

The well-established test for determining when private conduct may be deemed state action addresses those concerns by permitting "a private entity [to] qualify as a state actor" only in "limited circumstances." *Halleck*, 139 S. Ct. at 1928. Two separate requirements, both of which inquire into "whether the defendant" is effectively "clothed with the authority of state [or federal] law," must be satisfied.

*Pasadena Republican Club v. Western Justice Center*, 985 F.3d 1161, 1167 (9th Cir. 2021) (citation omitted); *Lugar*, 457 U.S. at 937.  First, the constitutional deprivation must "be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible."  *Lugar*, 457 U.S. at 937.  Second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor," either "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State."  *Id*.  This Circuit has distilled *Lugar*'s second requirement into four "intentionally demanding" tests:   "(1) the public function test, (2) the state compulsion test, (3) the nexus test, [or] (4) the joint action test."  *O'Handley*, 62 F.4th at 1157, 1159 (quoting *Lugar*, 457 U.S. at 939); *accord Halleck*, 139 S. Ct. at 1928 (listing circumstances).  As discussed further below, each test is designed to permit a finding of state action only when the state's control over or involvement in the private entity's conduct is so "pervasive" that the challenged actions may be said to be the state's.  *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 291, 295 (2001).[4]

_____

[4] Kennedy resists that conclusion, asserting that "*Brentwood* represented a sea change in the Supreme Court's state action jurisprudence" and "stopped the narrowing of the doctrine."  Br. 19.  To the contrary, *Brentwood*, like Supreme Court decisions before and after it, applied the relevant test (for a close nexus between state and private parties) in a demanding way, finding state action only because the state

24

**B.    Google does not exercise any right or privilege created by the state when moderating content on YouTube.**

The district court correctly held that Kennedy is not likely to satisfy *Lugar*'s first requirement because Google's adoption of YouTube's content moderation policies and its removal of the Kennedy videos was not "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State." *Lugar*, 457 U.S. at 937; *see* 1-ER-012.

Google does not exercise any state-created right in operating YouTube and moderating its content.  A private entity exercises a state-created right or privilege where, for instance, the entity invokes the assistance of the state against another private party, as in the case of the judicial attachment procedure at issue in *Lugar*. 457 U.S. at 942; *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (insurer acted pursuant to state-created privilege when withholding payments as authorized by comprehensive workers compensation statute).  Google obviously does not exercise a government-conferred authority when it decides what content is made

---

was "pervasive[ly]" entwined in the management and control of the association at issue.  531 U.S. at 291, 295.  That association was only "nominally" private because it was composed overwhelmingly of *public* schools and was run by public school officials "acting in their official capacity" who did not "merely control but overwhelmingly perform[ed]" virtually all of the association's actions.  *Id.* at 298, 300.  Far from representing any relaxation of the state-action standard, then, *Brentwood* demonstrates the highly intertwined circumstances in which a private entity might be deemed a state actor.  In all events, *Halleck*—decided after *Brentwood*—indisputably reaffirmed the demanding nature of the state-action test.

available on YouTube; Google's authority to make such decisions flows entirely from its status as the private owner and operator of YouTube. 1-ER-012; *see* 5-ER-1043–1044 (compliance with misinformation policy is a condition imposed by Google on the ability to post content on YouTube).

Google also does not enforce any rule of conduct imposed by the government. Its content moderation policies are its own, not something imposed by statute or regulation. Indeed, in analogous circumstances, this Court has held that Twitter's content moderation policies, which similarly were imposed by Twitter as a condition on the use of the platform, reflected neither a state-created privilege nor a state-imposed rule of conduct, and therefore did not satisfy *Lugar*'s first prong. *See O'Handley*, 62 F.4th at 1156. This case is no different.

Kennedy does not challenge the district court's conclusion that he has not satisfied *Lugar*'s first step. Under *Lugar*, that should be fatal to Kennedy's claim. *O'Handley*, 62 F.4th at 1157. This Court has remarked, however, that it has not applied the two-prong framework "rigidly," *id.*, and it has sometimes focused on the second prong alone, *Mathis v. Pacific Gas & Electric Co.*, 75 F.3d 498, 503 n.3 (9th Cir. 1996). At the very least, however, Kennedy's failure to satisfy the first requirement for proving state action "makes it much less likely" that he can satisfy the second, "because the two steps are united in a common inquiry into" whether the

defendant should be deemed to have exercised the power of the government. *O'Handley*, 62 F.4th at 1157.

### C. Google was not a state actor when it developed its content moderation policies and, years later, removed videos of Kennedy from YouTube.

Kennedy also cannot satisfy *Lugar*'s second requirement. 457 U.S. at 937. Kennedy contends that Google should be considered a state actor under the public function, nexus, and joint action tests; he makes no argument under the state compulsion test. *O'Handley*, 62 F.4th at 1157. The district court correctly found that Kennedy's evidence reveals nothing more than voluntary information sharing between Google and the government, and correctly concluded that the evidence fell far short of establishing state action under any applicable test. 2-ER-066.

### 1. Google does not perform a traditional, exclusive public function in maintaining the YouTube platform.

Kennedy cannot demonstrate that Google is a state actor on the ground that it performs a public function. To satisfy the public function test, the private entity must "exercise[] powers traditionally exclusively reserved to the State." *Halleck*, 139 S. Ct. at 1928 (citation omitted). It is "not enough" that the function serves "the public interest in some way"; rather, "the government must have traditionally *and* exclusively performed the function." *Id.* at 1928-29; *Lee v. Katz*, 276 F.3d 550, 555 (9th Cir. 2002). As a result, "very few" functions qualify as public for purposes of the state action test. *Halleck*, 139 S. Ct. at 1929 (citation omitted).

Kennedy asserts that Google performs a public function when it moderates content on YouTube, PI Reply 11, Dkt. 55, and in particular when it does so for public health reasons, Br. 3. But this Court has rejected that very argument. *See Prager Univ.*, 951 F.3d at 995 ("Despite YouTube's ubiquity and its role as a public-facing platform, it remains a private forum, not a public forum subject to judicial scrutiny under the First Amendment."). As this Court recognized, that conclusion is compelled by the Supreme Court's holding in *Halleck* that "merely hosting speech by others is not a traditional, exclusive public function." 139 S. Ct. at 1930.

That Google moderates content in furtherance of public health concerns does not make its actions any less private and independent. While the government certainly promotes public health, so too do private entities. Private employers, for instance, can and do adopt policies designed to prevent the spread of communicable diseases, and media companies and newspapers can and do adopt policies designed to weed out medical misinformation from their reporting. Promoting public health therefore does not fall within "the lean list of the 'very few' recognized public functions" that have traditionally been performed exclusively by the government. *Prager*, 951 F.3d at 998 (noting that the universe of exclusive public functions "includes 'running elections,' 'operating a company town,' and not much else"); *Halleck*, 139 S. Ct. at 1929 (activities that are not exclusive public functions include operating nursing homes, providing special education, and supplying electricity).

Kennedy does not mention *Prager*, instead relying exclusively on *Lee v. Katz*, *supra*. There, a private entity leased and operated a publicly owned plaza that the entity conceded was "a traditional public forum" for purposes of the First Amendment. *Lee*, 276 F.3d at 552. The Court accordingly found in those unusual circumstances that regulating speech on the plaza was an exclusive public function. Here, by contrast, Google does not operate a public forum that, absent Google's involvement, would be owned and operated by the government. That is why *Prager*—decided after *Lee*—expressly held that YouTube is not a public forum subject to First Amendment constraints.

### 2. Kennedy cannot meet the "demanding" standard of the nexus test.

Kennedy also cannot show that he is likely to satisfy the nexus test. That test asks, in relevant part, "whether government officials have [1] 'exercised coercive power or [2] [have] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *O'Handley*, 62 F.4th at 1157 (quoting *Blum*, 457 U.S. at 1004).

a. To establish state action through coercion, Kennedy must demonstrate that the government compelled Google to undertake "the *specific* conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004 (emphasis added). Generalized pressure is not sufficient. For instance, in *Blum*, the Court held that nursing homes were not acting as state actors in discharging or transferring patients, even though

29

extensive regulations backed by financial penalties created pressures on the nursing homes to do so. *Id*. at 1009. Despite those general pressures, there was no state action because the state did "not dictate the decision to discharge or transfer in a particular case," and discharge decisions "turn[ed] on medical judgments made by private parties," *id*. at 1008, 1010.

Consistent with those principles, this Court draws "a sharp distinction between attempts to convince and attempts to coerce." *O'Handley*, 62 F.4th at 1158. "[G]overnment officials do not violate the First Amendment when they request that a private intermediary not carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply." *Id*.; *accord Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (coercion with respect to speech requires a "threat of invoking legal sanctions [or] other means of coercion, persuasion, and intimidation").

State action by virtue of the government's significant encouragement is no easier to establish. Kennedy must show that the government offered such significant positive incentives that it "overwhelm[ed]" Google's independent judgment "and essentially compel[led] [Google] to act in a certain way." *O'Handley*, 62 F.4th at 1157-58. In other words, the encouragement must be so powerful "that the choice must in law be deemed to be that of the [government]." *Blum*, 457 U.S. at 1004. "Mere approval of or acquiescence in the initiatives of a private party is not sufficient

to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Id*. at 1004-05.

b.     Kennedy points to a few exchanges that in his view establish that the government coerced or significantly encouraged Google into adopting and enforcing its misinformation policy, Br. 7-8, but the evidence demonstrates no such thing.[5]

Most fundamentally, Kennedy cannot demonstrate that the purported governmental pressure could have influenced the "specific conduct" of which he complains, *Blum*, 457 U.S. at 1004—either Google's adoption of its vaccine misinformation policy, or its specific decision to remove the Kennedy videos. The governmental communications on which Kennedy relies began in April 2021, months *after* Google adopted its COVID-19 misinformation policy and updated its guidance specifically to prohibit COVID-19 vaccine misinformation. Google first adopted its COVID-19 misinformation policy in May 2020, and by April 2021, Google had been removing medical misinformation related to the COVID-19 vaccine from YouTube for months. 5-ER-0982–0983; *see* p. 7, *supra*. By October 2020, Google had already removed from YouTube more than 200,000 videos

---

[5] Although Kennedy argues on appeal that the government acted coercively towards Google, he conceded below that there is insufficient evidence of coercion in the record to justify preliminary relief. 2-ER-029 (PI Hearing Tr. 8:20-24). Kennedy therefore cannot argue state action by virtue of coercion on appeal. *See AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1213 (9th Cir. 2020). But in any event, Kennedy's arguments fall far short of establishing either coercion or significant encouragement.

"related to dangerous or misleading Covid-19 information." 2-ER-137. And by December 2020, Google's policy explicitly prohibited the precise kind of misinformation—COVID-19 *vaccine* misinformation—that triggered removal of the videos at issue in this case. *See* 5-ER-0983; 5-ER-1030, 1037; 6-ER-1232. Because Google had a prohibition on COVID-19 vaccine misinformation in place well before the government action Kennedy complains about, that action *could not* have compelled (or even encouraged) adoption of the challenged policies.[6] As for Google's removal of the videos of Kennedy specifically, the removal did not occur until almost *two years* after the identified governmental communications (which did not pertain in any way to Kennedy specifically)—and thus there is no reason to think that the government had anything to do with the removal.

---

[6] Kennedy asserts in passing that his videos were removed not pursuant to Google's pre-existing COVID-19 vaccine misinformation policy, but instead pursuant to the broader policy that Google adopted in September 2021. Br. 9. But that amendment did not alter Google's existing COVID-19 vaccine misinformation policies; it instead expanded Google's COVID-19 vaccine policy to misinformation about *all* vaccines. The document Kennedy cites proves as much. *See* pp. 7–8, *supra*; 5-ER-1129 (September 2021 email from Google stating that "we have" a COVID-19 vaccine misinformation policy, and "[w]e just announced that we will be introducing a new policy" that applies to all vaccines); 5-ER-983–984. Kennedy does not dispute that his videos were removed based on COVID-19 misinformation, or that the pre-existing policies prohibited that misinformation. Moreover, the alleged governmental pressure on which Kennedy relies concerned COVID-19 vaccine misinformation—which was already addressed by YouTube's 2020 guidelines— rather than the broader category of all vaccine-related misinformation that was addressed by the expanded 2021 guidelines. *See, e.g.*, 6-ER-1240–1242, ¶¶ 27, 31. The September 2021 expansion of the policy to all vaccines is therefore irrelevant to Kennedy's claims.

In all events, the communications that Kennedy identifies can hardly be described as coercion or significant encouragement. Kennedy points primarily to July 2021 public statements by the President to the effect that COVID-19 misinformation on Facebook was "killing people." 5-ER-1213–1214. But the President never mentioned Google or YouTube. *Id.* And in the very same interview, President Biden disavowed the understanding Kennedy seeks to ascribe to that statement—that (as Kennedy puts it) "technology companies like Google were 'killing people,'" Br. 8—by stating that "Facebook isn't killing people" and that "[m]y *hope* is that . . . [Facebook] would do something about the misinformation." 5-ER-1214 (emphasis added). This presidential expression of "hope" that private companies would address misinformation is no different from any President's use of the bully pulpit to urge private industry to act for the public good. Such general public statements do not express the sort of implicit or explicit threat of legal penalties that would be necessary to demonstrate coercion, and they do not constitute the type of significant encouragement that could "overwhelm" private entities' judgment. *O'Handley*, 62 F.4th at 1157-58; *Blum*, 457 U.S. at 1004; *cf. Kennedy v. Warren*, 66 F.4th 1199, 1208 (9th Cir. 2023) (rejecting Kennedy's claim that senator violated the First Amendment by coercing Amazon to remove his book, and observing that public officials routinely and permissibly use "strong rhetoric" in urging private parties to act in the public interest).

33

Kennedy also relies on a July 2021 comment from a White House spokesperson that the Administration was "reviewing" immunity under Section 230 of the Communications Decency Act. Br. 8; 5-ER-1218. Kennedy characterizes these statements as threats to revoke Section 230 immunity if platforms did not remove COVID-19 vaccine misinformation. Not so. President Biden specifically noted he was "*not* trying to hold [platforms] accountable," but was instead trying to persuade them to "do more." 5-ER-1214 (emphasis added). And the White House press secretary also clarified that it was "up to Congress to determine how . . . to proceed" on the Communications Decency Act, 5-ER-1215, as only Congress, not the President, has the power to amend that statute. In any event, general statements about considering whether to narrow Section 230 immunity, divorced from any particular company's misinformation policy or any particular takedown decision, do not relate to the "specific conduct" in question. *Blum*, 457 U.S. at 1004 (state must be responsible for the "specific conduct of which the plaintiff complains"). Moreover, government officials often muse about increasing regulation if an industry does not self-regulate effectively, and such statements cannot possibly be sufficient to render every company in that industry a state actor. *Cf. Halleck*, 139 S. Ct. at 1930-31.

The remaining communications in the record—which Kennedy barely mentions—are even farther afield from anything that could be called coercion or

coercive encouragement. White House official Flaherty's April 2021 meeting with, and email to, Google, merely expressed the White House's "concern[]" about vaccine misinformation and sought information about Google's approach to the problem. 5-ER-1084. The CDC's emails to Google inviting it to "meetings on [COVID] misinformation" with representatives from other online platforms contain no indication that those meetings involved coercive pressure (or overwhelming incentives) with respect to specific policies or speech. 5-ER-1149 (Crawford Email). Indeed, the CDC official's deposition testimony confirmed that the meetings did not involve crafting any misinformation policy, let alone telling "any . . . social media company on how they should apply their policies . . . toward a particular post." 2-ER-252; 2-ER-250–251. Finally, July 2021 communications between Google and the Surgeon General's Office reveal that Google was *independently* seeking to limit vaccine-related misinformation on its platform without any prompting by the government. *See* 5-ER-1095–1097; 5-ER-1124–1126.

No decision of this Court or the Supreme Court has found state action under the nexus test in circumstances like these. Quite the contrary. In *O'Handley*, for instance, this Court held that California's establishment of an office devoted to flagging and requesting takedown of tweets containing misinformation, and Twitter's compliance with 98% of the State's takedown requests, did not amount to either coercion or significant encouragement. "With no intimation that Twitter

would suffer adverse consequences if it refused the request (or receive benefits if it complied), any decision that Twitter took in response was the result of its own independent judgment in enforcing its Civic Integrity Policy." 62 F.4th at 1158-59.

The district court's holding that there was no coercion or significant encouragement follows a fortiori from *O'Handley*. Here, unlike in *O'Handley*, there is no evidence that the government and Google collaborated on any individual takedown decisions. Nor is there any evidence that Google collaborated with the government on the content of YouTube's COVID-19 misinformation policy—much less that the government coerced or induced Google in any way. 1-ER-015 (district court finding that there was "no evidence before the Court that any of the identified government officials, who are not parties to this case, demanded"—via positive or negative incentives—"that Google adopt a COVID-19 medical misinformation or vaccine misinformation policy"); 2-ER-066 (the record "does not show any government inducement"). The scattered statements in the record—including the President's statements—reflect the government's understanding that Google (and other platforms) were free to make their own decisions with respect to misinformation. Government officials regularly use their public platform to encourage citizens and companies to take action that the government views as being in the public interest. That the government might have wished for even more aggressive content moderation, and might have approved of increased takedowns,

does not render Google and other platforms state actors. *Blum*, 457 U.S. at 1004-05. If it did, the realm of state action would be vastly increased and the sphere of private liberty vastly diminished. *Halleck*, 139 S. Ct. at 1930-31.

c. Kennedy's contrary arguments lack merit. Kennedy relies almost entirely on the Fifth Circuit's decision in *Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023) ("*Missouri*"), which held that private platforms' content moderation decisions constituted state action because the government had, in the Fifth Circuit's view, exercised "control" over the platforms' decisions. That reliance is unavailing for multiple reasons.

For one thing, the Supreme Court has granted certiorari to review the Fifth Circuit's decision—and stayed the lower courts' injunction—in response to the United States' petition asserting that *Missouri* is irreconcilable with the Supreme Court's state action precedents, including *Blum* and *Halleck*—the very decisions that compel ruling for Google on the record here. *See Murthy v. Missouri*, No. 23-411, 2023 WL 6935337 (U.S. Oct. 20, 2023); U.S. Application, No. 23A243, at 30-32 (Sept. 14, 2023) (explaining that Fifth Circuit found "significant encouragement" based on a "novel" standard that, contrary to *Blum* and *American Manufacturers*, permitted "recommendation[s]" and "advice" to count as coercive encouragement); *id.* at 22 (noting tension with *Halleck*).

37

In all events, the Fifth Circuit's *Missouri* decision does not help Kennedy. The very passages of the decision that he quotes describe the government as having "push[ed] changes to the platforms' policies through [the government's] expansive relationship with and informal oversight over the platforms," and as having "constantly monitored their moderation activities." Br. 24-25 (quoting decision). Kennedy conceded below that the record in *this* case is devoid of any comparable evidence of government involvement, and that the best evidence in the Fifth Circuit case "was being presented against Facebook," not Google. 2-ER-029 (PI Tr. 8:7-24). Indeed, *Missouri* cannot suggest that the government acted coercively towards Google in *this* case, as the Fifth Circuit elected to treat evidence involving various platforms interchangeably, obscuring which platforms exchanged which communications with the government, and it said little about Google and nothing about Kennedy. *See, e.g.*, *Missouri*, 83 F.4th at 364 (discussing communications exchanged between federal officials and "the platforms"). For that reason and others, the Sixth Circuit has recognized that *Missouri*'s conclusions cannot be extended to other cases involving the same platforms. *Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 497, 498 n.8 (6th Cir. 2023) (finding no state action on the ground that Twitter made its own decisions in enforcing "its own COVID-19

policy" as to the specific plaintiffs in that case).  This Court similarly should accord *Missouri* no force here.[7]

### 3. Kennedy cannot satisfy the joint action test.

The district court also correctly rejected Kennedy's effort to use the joint action test to demonstrate that Google engaged in state action.  2-ER-066 (The record "falls very short of [showing] any direct involvement by the Government."); *see* 1-ER-016.

a.    The Supreme Court and this Court have found state action on joint action grounds only where "the State ha[s] so far insinuated itself into a position of interdependence with the [private entity] that it [is] a joint participant in the

---

[7] Separately, the plaintiff in *O'Handley* sought certiorari, and the Supreme Court appears to be holding the *O'Handley* petition pending its decision in *Murthy v. Missouri*.  Pet. No. 22-1199 (S. Ct.) (presenting similar question as *Missouri*: whether state officials violated the First Amendment by recommending that Twitter take down the plaintiff's posts).  That is the Court's standard practice when a certiorari petition presents questions that are similar to those at issue in a granted case.  Stern & Gressman, *Supreme Court Practice* § 6.31(E).

This Court need not hold this case pending the Supreme Court's resolution of *O'Handley* (and *Murthy*).  For the reasons stated in the text, this case involves far less evidence of government collaboration even than *O'Handley* and none of the evidence on which the Fifth Circuit relied in finding coercion in *Missouri*.  Regardless of how the Supreme Court resolves those cases, the conclusion that Google was not a state actor here is compelled by both longstanding and recent Supreme Court precedent, including *Blum* and *Halleck*, and by the complete absence of evidence of coercion or significant encouragement in the record of this case.  Finally, the only question that this Court may resolve at this juncture is whether the district court correctly held that Kennedy is not entitled to a preliminary injunction under existing law.

enterprise." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357-58 (1974); *accord Brentwood*, 531 U.S. at 298 (requiring "pervasive entwinement"). It is not enough that the private entity is "heavily regulated" by, or acts in conjunction with, the government. *Jackson*, 419 U.S. at 358. In *Sullivan*, for instance, the Court held that the fact that insurers withheld payments pursuant to an "extensive[]" worker's compensation regulatory scheme that "creat[ed], supervis[ed], and set[] standards for" of withholding payments, required notification of the state when payments were withheld, and involved state monitoring for compliance before permitting withholding, did not give rise to the necessary interdependence. 526 U.S. at 54, 57-58.

This Court has accordingly explained that joint action exists only when the government "significantly involves itself in the private parties' actions and decisionmaking" in a "complex and deeply intertwined process." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th Cir. 2020) (citation omitted); *accord O'Handley*, 62 F.4th at 1159; *Mathis*, 75 F.3d at 503 ("A private person is liable under [the joint action] theory, however, only if the particular actions challenged are inextricably intertwined with those of the government."). The relevant "interdependence," moreover, must pertain to *the challenged activity*." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (citation and internal quotation marks omitted).

b.     Nothing close to inextricable entwinement is present here.  First, and most fundamentally, the mid-2021 communications between Google employees and government officials—which are the *only* government interactions Kennedy has identified—postdated Google's adoption of the policy pursuant to which it removed the Kennedy videos.  There is therefore no evidence whatsoever that the government was involved in *any* manner in the "challenged activity" of adopting that policy— much less in an "interdependen[t]," *Tsao*, 698 F.3d at 1140 (citation omitted), or "deeply intertwined," *O'Handley*, 62 F.4th at 1159 (citation omitted), way.   In addition, Google did not remove Kennedy's speech from YouTube until nearly two years after the government communications Kennedy has identified—and Kennedy has not contended that the government was involved, let alone deeply intertwined, in those decisions.   The record is thus clear:   Google developed its policies independently, and enforced them independently, when removing content featuring Kennedy's speech.  Those points alone are fatal to Kennedy's joint action theory. *See Mathis*, 75 F.3d at 504.

In all events, the 2021 interactions pertaining to COVID-19 misinformation between Google and the government that Kennedy has identified fall far short of inextricable entwinement.  The *entirety* of those interactions consists of (over the course of eight months) two 20-minute meetings between platforms and the CDC, 3-ER-346, 414; a single meeting between White House official Flaherty and Google,

reflected in a follow-up email in which Flaherty asked for more information about the content and effectiveness of Google's existing misinformation practices, 5-ER-1084; and four meetings over five months with the Surgeon General's Office, which primarily involved each party providing the other with notice about what it was doing to address misinformation, 5-ER-1087–1088. Those sporadic interactions are far from the "complex and deep[]" entwinement that the joint action test requires. *Rawson*, 975 F.3d at 753.

The substance of the interactions confirms that there is no entwinement whatsoever between Google and the government. The CDC meetings did not involve "crafting the content policy" of "any . . . social media company," and the CDC never "g[ave] input on what such a policy should look like," 2-ER-250–251, or "help[ed] any . . . social media company on how they should apply their policies . . . toward a particular post," 2-ER-252. The meetings with the Surgeon General's Office involved Google informing the government of what work it was "already doing" to address misinformation, not any sort of government control over or entwinement with Google's policies or their enforcement. 5-ER-1094–1096, 1100–1101. As for the communication with Flaherty, the fact that Flaherty asked Google for more information about its practices demonstrates that the government did not have detailed information about those practices—underscoring the *absence* of any interdependence. Finally, in each instance in which Google removed Kennedy's

42

speech, Kennedy concedes that Google cited only its own application of its own policies for removing the videos. *See, e.g.*, 6-ER-1232; *see also* 5-ER-1024 (Google told Kennedy it removed his posts "for violating [its] policies on COVID-19 vaccine misinformation").

This Court has repeatedly held that even much more substantial interactions with the government do not rise to the level of joint action. For instance, this Court held that the extensive coordination between the government and Twitter in *O'Handley* did not give rise to the requisite entwinement because the interactions amounted merely to "consultation and information sharing," and "in every case," "company[] employees" made their own decision about whether to take down the flagged posts based on Twitter's policies. 62 F.4th at 1160 (quoting *Mathis*, 75 F.3d at 504). Because the government had neither "interjected itself into the company's internal decisions" nor "played any role in drafting Twitter's" policy, Twitter retained control over its content moderation decisions and was not a state actor. *Id.* The result here follows a fortiori from *O'Handley*: not only is it clear that the government played no role in drafting the policies at issue, but it is also undisputed that the government did not have any involvement in the decision to remove Kennedy's speech. *See* 1-ER-016 (district court finding that Kennedy submitted even "less evidence of entwinement" than "in *O'Handley*"); 2-ER-066; *accord Pasadena Republican Club*, 985 F.3d at 1171 (finding no entwinement where

43

government was not involved in developing public lessee's allegedly discriminatory policy).[8]

c.     Kennedy's contrary arguments lack merit.  Kennedy primarily contends that Google's policy depends entirely on government sources to determine what speech gets removed from YouTube, and that as a result, "it is the government, not Google, that is responsible for getting Kennedy's speech removed from YouTube." Br. 21.  That is both factually and legally incorrect.

Google's decision to refer to health guidelines developed by experts in determining what constitutes COVID-related misinformation does not deprive Google of the ultimate control over the substance of its policies or the content on its site.  And Google's unilateral reference to government sources does not make the government an active participant in Google's formulation of its policies or its enforcement decisions pursuant to those policies, as would be necessary to show pervasive entwinement.  *O'Handley*, 62 F.4th at 1160.  Google may always change

---

[8] Kennedy complains (Br. 15) that the district court gave "short shrift" to *Rawson*, *supra*.  But the contrast between the facts of that case and the facts here only highlights the lack of deep entwinement here.  *Rawson* concerned the unique context of involuntary commitment, and it held that the private parties' actions were entwined with those of the government because state law imbued the private facility with state authority, and the local prosecutor had "heav[y] involve[ment]" in decision-making, including by "alter[ing]" the private doctor's "medical diagnosis" so as to extend the plaintiff's involuntary commitment.  975 F.3d at 754.  Nothing like that is present here.  *Accord O'Handley*, 62 F.4th at 1160 (distinguishing *Rawson*).

its policies, and even under the applicable policies must make independent judgments about whether the content "contradicts" those guidelines or "poses a serious risk of egregious harm." 5-ER-1052.

Kennedy's argument also is irreconcilable with the Supreme Court's decision in *Halleck*. There, the plaintiffs challenging the cable operator's refusal to air their program argued that the state's "heav[y]" regulation of the cable channel, including "restrictions" on its "editorial discretion," converted the cable operator into a state actor. *Halleck*, 139 S. Ct. at 1932. The Court rejected that argument, explaining that its decisions had "never even hinted that regulatory control, and particularly direct regulatory control over a private entity's First Amendment speech rights," could justify subjecting the regulated private entity to the constraints of the First Amendment." *Id*. at 1932-33 (citation omitted). Under that reasoning, even if the government's public health guidelines were legally *binding* on Google, that would not justify treating Google as a state actor subject to First Amendment constraints. *See id*. at 1933.

That logic applies with even greater force here because Google has voluntarily chosen to consider governmental and nongovernmental sources of expert health information in making its own content moderation decisions. Google's decision to consult government sources in making those decisions is *itself* First Amendment-protected conduct: Google has chosen to exercise its discretion over the speech

45

permitted on its platform by referencing public sources. *See id.* For that reason, adopting Kennedy's theory of state action—under which mere reliance on government information transforms a private party into a state actor—is "especially problematic in the speech context," because it could vitiate private entities' First Amendment rights to exercise editorial control on their platforms. *Id.* at 1932; *see also Denver Area Ed. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 829 (1996) (Thomas, J., concurring in the judgment in part and dissenting in part).

## II. KENNEDY HAS NOT SHOWN THAT HE WILL SUFFER IRREPARABLE HARM.

The district court correctly concluded that Kennedy failed to show that he will suffer irreparable harm absent injunctive relief. 1-ER-016–017; 2-ER-66. Kennedy's sole theory of irreparable harm is that "[t]here is no dispute that Kennedy has alleged a colorable First Amendment claim"; therefore, he contends, he "will suffer irreparable harm." Br. 32, 37. Kennedy's irreparable harm argument fails for the same threshold reason that his claim cannot succeed on the merits—Google is a private company that is not engaged in state action when it applies its own policies to remove COVID-19 misinformation from its platform. Although a "colorable First Amendment claim" may constitute irreparable injury, *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citation omitted), a "tenuous" one does not, *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)—and Kennedy's claim does not even rise to the level of tenuous. Lacking any colorable First Amendment

claim, Kennedy fails to demonstrate irreparable harm. *See CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019).

The district court also correctly held that Kennedy had not demonstrated any irreparable injury separate from the claimed denial of his First Amendment rights. 1-ER-016–17. As the court found, Kennedy's assertion that the removal of the videos creates "hurdles to his campaign" is nothing more than an "[a]bstract claim[]" unsupported by any evidence, 1-ER-016, particularly given that the videos remain available on other major platforms and Kennedy himself described having videos removed by Google as "a badge of honor," 1-ER-017. The district court also correctly held that Kennedy's repeated delays in prosecuting this case undermine any suggestion that he will suffer irreparable harm. Kennedy's NHIOP speech was removed from YouTube in March 2023, *see* 5-ER-1031–1032, and Kennedy declared his candidacy for President in mid-April, 5-ER-1023, ¶ 3. Yet he waited until August—five months later—to file suit. That delay belies any claim of irreparable harm. *See Oakland Trib., Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). While Kennedy implies that the delay was occasioned by "repeated requests" to Google that it reinstate his video, Br. 44-45, he has provided no evidence to that effect (and in any event, such requests would not have prevented Kennedy from filing suit). *See Garcia v. Google, Inc.*,

786 F.3d 733, 746 (9th Cir. 2015) (holding that the district court did not abuse its discretion in finding delay to undercut irreparable harm). The district court did not abuse its discretion in holding that Kennedy failed to establish irreparable injury.

## III. THE BALANCE OF EQUITIES WEIGHS POWERFULLY AGAINST GRANTING A PRELIMINARY INJUNCTION.

Kennedy cannot establish that the balance of equities tips in his favor—much less that it tips "sharply" in his favor. *See All. for the Wild Rockies*, 632 F.3d at 1135; footnote 3, *supra*. In assessing the balance of equities, a court must examine "the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted). Here, Kennedy has not demonstrated that he suffers any harm from Google's application of its content policies, while Google would be deprived of its *own* First Amendment rights if it were subject to an injunction mandating that it carry certain speech against its will. The balance of equities therefore tips decidedly in Google's favor.

A. Most importantly, the relief Kennedy seeks would violate Google's First Amendment rights. The "choice of material to" publish "and the decisions made" as to the "treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" and are protected by the First Amendment. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256-58 (1974) (newspaper's decision that certain material "should not be published" is protected speech, and state cannot compel newspapers to print replies on certain

subjects). That principle applies with full force to platforms that decide what content to offer viewers. In *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 636-37 (1994), the Supreme Court held that cable companies' decisions about what stations to offer their customers were protected speech, and that government-imposed rules requiring cable companies to carry certain stations implicated the cable operators' First Amendment rights. Just as a cable operator "speaks" when it selects what networks to offer, Google "speaks" by selecting what content it will permit and not permit viewers to see on YouTube. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) (selection of cable "programming originally produced by others," presentation of an "edited compilation" of articles written by others, and selection of "contingents to make a parade" are all "core" First Amendment activities entitled to protection).

Indeed, Google's First Amendment interests in its content moderation policies are far stronger than the cable operators' interests in *Turner Broadcasting*. There, the Court held that cable operators' interests warranted only intermediate scrutiny because there was "little risk" that cable viewers would understand the channels offered by the cable system to convey messages endorsed by the cable company. 512 U.S. at 655. Here, by contrast, users may well understand videos on YouTube to be endorsed (or at least not repudiated) by Google. Google's content moderation policies are expressly content based and are communicated to users in those terms.

Those policies are thus a reflection of Google's "belie[fs]" about what "people should be able to share" on YouTube. 5-ER-1044, Street Decl. Ex. C-1. Where, as here, an entity's inclusion of particular messages on its platform could be understood to convey endorsement (or at least lack of disagreement) with the content of the messages, the Supreme Court has held that the entity's First Amendment interests are at their zenith. *See Hurley*, 515 U.S. at 574 (distinguishing *Turner Broadcasting* on the ground that "the [parade organizer] clearly decided to exclude a message it did not like from the communication it chose to make, and that is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another").[9]

Kennedy concedes that the government "compel[s] speech" where it "force[s]" a platform to "accommodate" speech it would rather not accommodate, Br. 40-41, but argues that Google is not entitled to protection against that sort of compulsion. Google, in Kennedy's view, "is not a publisher" because, under Section

---

[9] In *NetChoice, LLC v. Paxton*, 49 F.4th 439, 466 (5th Cir. 2022), the Fifth Circuit held that platforms' content moderation activities are "not speech under the First Amendment." The Supreme Court has granted certiorari to review that decision, along with an Eleventh Circuit decision that reached a contrary conclusion. *See NetChoice, LLC v. Paxton*, No. 22-555, 2023 WL 6319650 (U.S. Sept. 29, 2023); *Moody v. NetChoice, LLC*, No. 22-277, 2023 WL 6319654 (U.S. Sept. 29, 2023). Well-established Supreme Court precedent like *Hurley*, *Miami Herald*, and *Turner Broadcasting* leave no doubt that exercising editorial discretion over what messages to permit on one's platform (whether that platform is a cable system, parade, a newspaper op-ed page, or a social media site) constitutes protected speech.

230 of the Communications Decency Act, Google "cannot be held liable for the content its users publish." Br. 41 (emphasis omitted). That is a non-sequitur. Congress's decisions to legislatively grant online platforms immunity for third-party content appearing on the platforms has no bearing on whether, under the *Constitution*, the platforms' content moderation decisions constitute protected speech.

Kennedy also contends that Google does not engage in expressive activity when it facilitates the posting of videos on YouTube because it allows most videos to be uploaded without extensive review. Br. 42. But that similarly misses the point. The expressive action at issue here is Google's decision to remove certain content from its platform. That is no different from the decisions to exclude certain content that were held to be protected speech in *Hurley* and *Miami Herald*. Further, Kennedy's own documents demonstrate that Google removes videos only after "careful[]" review and assessment against its policies. 6-ER-1231, A. Kennedy Decl. Ex. A. (Takedown Notice).

B. In addition to its interest in vindicating its First Amendment protections, Google has a strong interest in the application of its own content moderation policies in maintaining users' goodwill and trust in its platform. As YouTube's relevant medical misinformation policy—which prohibited "content about COVID-19 that poses a serious risk of egregious harm"—stated, the "safety

of our creators, viewers, and partners is our highest priority" and "[w]e look to each of you to help us protect this unique and vibrant community." 5-ER-1047. Forcing YouTube to host content that it believes violates these policies would directly undermine its users' trust in Google and the application of its policies to its own platform.[10]

## IV. THE PUBLIC INTEREST FAVORS DENYING A PRELIMINARY INJUNCTION.

As the district court correctly held below, the public interest also weighs heavily against temporary injunctive relief. 1-ER-018. The requested injunction would violate Google's First Amendment rights, and there is a "significant public interest in upholding First Amendment principles." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

---

[10] Kennedy's requested injunction—which would bar *any* enforcement against him regardless of whether it was the product of state action—is overbroad and prohibited by this Court's precedents. In *Carlin Communications*, this Court held that the defendant phone company had engaged in state action in removing the plaintiff's messages from its service, yet refused to enjoin the defendant from excluding such messages in the future. *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1296-97 (9th Cir. 1987). The Court reasoned that "[i]t does not follow [from the initial state action determination] . . . that [the defendant] may never thereafter decide independently to exclude [the] messages . . . . It only follows that the state may never induce [Defendant] to do so." *Id.* (emphasis omitted). To be entitled to such a dramatic remedy, Kennedy would need to offer evidence that any *future* application of YouTube's policies would amount to state action. He has not even attempted to do so.

In addition to violating Google's rights, mandating the distribution of medical and vaccine misinformation on YouTube would harm Google's users. As the Office of the Surgeon General materials attached to Kennedy's motion state, "the proliferation of health misinformation during the pandemic has been both extensive and dangerous" and threatens "the nation's health." 5-ER-1131. In *Doe v. San Diego Unified School District*, 19 F.4th 1173 (9th Cir. 2021), this Court held that the public interest "weigh[ed] strongly" against enjoining a school district's vaccine mandate where the "record indicate[d] that vaccines are safe and effective at preventing the spread of COVID-19," and that "mandate is therefore likely to promote the health and safety of [school] students and staff, as well as the broader community." *Id*. at 1181. The same rationale applies here. Forcing Google to host and serve medical and vaccine misinformation on YouTube that the record identifies as "a threat to the nation's health," 5-ER-1131, would harm Google's users and the public at large, and therefore be contrary to the public interest.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order denying the motion for a preliminary injunction.

DATED: January 3, 2024                    Respectfully submitted,


                                          /s/ Ginger D. Anders
                                          Ginger D. Anders
Jonathan H. Blavin                        Donald B. Verrilli, Jr.
Juliana Yee                               Helen E. White
Carson Scott                              MUNGER, TOLLES & OLSON LLP
MUNGER, TOLLES & OLSON LLP                601 Massachusetts Avenue NW
560 Mission St.                           Suite 500E
27th Floor                                Washington, DC 20001
San Francisco, CA 94105                   Telephone: (202) 220-1100
Telephone: (415) 512-4000                 Ginger.Anders@mto.com


    *Counsel for Defendants-Appellees Google LLC and YouTube, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system.

DATED: January 3, 2024          */s/ Ginger D. Anders* _____
Ginger D. Anders
*Counsel for Defendants-Appellees*
*Google LLC and YouTube, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,762 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

DATED:  January 3, 2024

*/s/ Ginger D. Anders*
Ginger D. Anders
*Counsel for Defendants-Appellees*
*Google LLC and YouTube, LLC*

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, Appellees state that they do not know

of any related case pending in this Court.

DATED:  January 3, 2024          */s/ Ginger D. Anders*  
                                 Ginger D. Anders  
                                 *Counsel for Defendants-Appellees*  
                                 *Google LLC and YouTube, LLC*